898 A.2d 559

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Freeman MAY, Appellant.**

Supreme Court of Pennsylvania.

Submitted May 25, 2004.

Decided May 25, 2006.

Stuart Brian Lev, Esq., Philadelphia, for Freeman May.

Amy Zapp, Esq., Deirdre Ann Eshelman, Jonelle Harter Eshbach, Esq., Harrisburg, for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, NEWMAN, SAYLOR, EAKIN, BAER, and BALDWIN, JJ.

### *OPINION ANNOUNCING THE JUDGMENT OF THE COURT*

Justice NEWMAN.

Freeman May (May) appeals from an Order of the Court of Common Pleas of Lebanon County (PCRA court) denying his Petition for Post–Conviction Relief pursuant to the Post–Conviction Relief Act[1] (PCRA). For the reasons set forth herein, we affirm in part and reverse in part the decision of

1. 42 Pa.C.S. § 9541, *et seq.*

the PCRA court. Because we conclude that the trial court erred during the 1995 re-sentencing hearing, we vacate the Judgment of Sentence and remand the matter for a new penalty phase.

## FACTS AND PROCEDURAL HISTORY

The facts and procedural history herein recapitulated are taken in large part from our Opinions in this case on direct appeal, *Commonwealth v. May*, 540 Pa. 237, 656 A.2d 1335 (1995) (*May I*), and *Commonwealth v. May*, 551 Pa. 286, 710 A.2d 44 (1998) (*May II*), cert. denied, 525 U.S. 1078, 119 S.Ct. 818, 142 L.Ed.2d 676 (1999). In 1988, in a remote wooded location in Lebanon County, a man discovered human skeletal remains buried under logs, brush, and leaves. Dr. Neil A. Hoffman (Dr. Hoffman), a forensic pathologist, determined that the remains were those of Kathy Lynn Fair (Fair), whose sister had reported her missing on September 4, 1982, when Fair did not show up for an outing. Dr. Hoffman concluded that the cause of death was multiple stab wounds inflicted by a short, single-edged weapon, most likely a knife.

The police arrested May in 1990, and the Commonwealth charged him with the murder of Fair. At trial, Detective Michael F. Wahmann (Detective Wahmann) testified that, at the time the remains of Fair were discovered, he remembered an incident that occurred in December of 1982. In that series of events, two girls, G.S. and S.S., who had accepted rides from May, were stabbed with a short, folding single-edged knife and left for dead not far from the place where Fair's remains were ultimately discovered; both G.S. and S.S. survived the attack. In addition, one of the young women had been raped. The Commonwealth had charged May with two counts each of attempted murder,[2] aggravated assault,[3] and reckless endangerment of another person,[4] and one count of

2. 18 Pa.C.S. §§ 901, 2502.
3. 18 Pa.C.S. § 2702.
4. 18 Pa.C.S. § 2705.

rape.[5] A jury convicted May of all crimes charged in connection with the December 1982 assaults.

Stanley May (Stanley), May's brother, testified that May came to his house on December 17, 1982, and confessed to him that he had stabbed a girl and buried her in the brush several months prior, and had done it again the night before. Stanley also stated that May always carried a folding buck knife, which is a short, sturdy, single-edged knife. Denise DeHaven (DeHaven), May's wife, stated at trial that when she visited him in jail in connection with the 1982 rape and assaults, May told her that he had hurt another girl and buried her under leaves and bushes in the woods. Subsequently, May wrote letters to DeHaven reiterating the same story. Thomas W. Fryberger (Fryberger), an acquaintance of May, testified that May had taken him and two girls up to a wooded location; Fryberger later took a state police trooper to that location, which is where Fair's remains were eventually found. Charles W. Neidig (Neidig), an inmate at the prison where May was incarcerated, testified that he had a conversation with May in the prison yard when May returned from a hearing held in connection with the rape and assault convictions. May indicated to Neidig that the hearing did not go very well because the police were going to be able to "put a body on him" and that he "did it."

Following trial, a jury convicted May of first-degree murder [6] in connection with the stabbing death of Fair. After a separate penalty hearing, the jury found the existence of one aggravating circumstance, that the killing was committed while May was perpetrating a felony,[7] namely rape, and one mitigating circumstance, that he had no significant history of prior criminal convictions.[8] The jury determined that the aggravating circumstance it found unanimously outweighed the mitigating circumstance and, consequently, the trial court

5. 18 Pa.C.S. § 3121.

6. 18 Pa.C.S. § 2502(a).

7. 42 Pa.C.S. § 9711(d)(6).

8. 42 Pa.C.S. § 9711(e)(1).

sentenced May to death. On direct appeal, this Court affirmed the conviction, but reversed the sentence, concluding that the jury could not properly consider whether May committed murder while in the perpetration of a rape because the court never instructed the jury on the elements of rape. *May I,* 656 A.2d at 1344–45. Accordingly, we remanded the matter for a new penalty phase. Mr. Justice Castille filed a dissenting opinion, in which he opined that, despite the jury's statement that the predicate felony was rape, the predicate felony was in fact **attempted** rape, a crime on which the court did charge the jury.

The trial court conducted the second penalty hearing on December 4, 1995, at which time the new jury found one aggravating circumstance, a significant history of felony convictions involving the use or threat of violence to the person,[9] and no mitigating circumstances. The trial court imposed a sentence of death pursuant to 42 Pa.C.S. § 9711(c)(1)(iv), which requires a death sentence if the jury finds at least one aggravating circumstance and no mitigating circumstances. On September 19, 1996, the trial court denied post-trial motions, prompting a direct appeal to this Court. We affirmed the Judgment of Sentence, concluding, *inter alia,* that May was not entitled to an instruction that life means life without the possibility of parole because May's future dangerousness was not at issue. *See May II,* 710 A.2d at 46–47 (citing *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994)). Then–Chief Justice Zappala and Mr. Justice Nigro filed concurring opinions, both reiterating their views that the jury should be provided with a "life means life" instruction in every death penalty case. *See Commonwealth v. Clark,* 551 Pa. 258, 710 A.2d 31, 43–44 (1998) (Zappala, C.J.E., concurring; Nigro, J., concurring).

On February 18, 1999, Petitioner initiated PCRA proceedings by filing a *pro se* form Petition and motions for stay of execution and appointment of counsel. *Pro bono* counsel subsequently filed an amended PCRA Petition, raising more than a dozen substantive issues. By Order dated April 12,

9. 42 Pa.C.S. § 9711(d)(9).

2001, the PCRA court denied relief on all of May's issues, except for his contention that trial counsel were ineffective for failing to investigate, develop, and present mitigating evidence of May's allegedly traumatic childhood, on which the court granted an evidentiary hearing. Initial Brief of Appellant, Appendix 2 at 1–3. Following the evidentiary hearing, by Order dated March 26, 2003, the PCRA court denied relief on the sole remaining issue and dismissed the PCRA Petition. May has appealed the denial of PCRA relief to this Court.

## DISCUSSION

May raises numerous contentions, some stemming from his 1991 trial and direct appeal therefrom, and others arising from the 1995 re-sentencing. For clarity of discussion, we have renumbered, reordered, and regrouped the arguments, dealing first with the 1991 guilt phase and then with the 1995 penalty phase. Because we ultimately grant May relief in the form of a new penalty phase, many of his allegations of error from that proceeding are rendered moot and, therefore, unreviewable.

### Issue 1—Testimony of Detective Hogan and Barbara Turner

May first contends that his appellate counsel [10] were ineffective for failing to appeal the decision of the trial court to disallow his attempt to present the Investigative Report of Lancaster County Police Detective Charles Hogan (Detective Hogan). To demonstrate ineffective assistance of counsel, one must show that (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her

10. Joseph Farrell, Esquire, and Timothy Sheffey, Esquire, represented May at his 1991 trial and sentencing, his direct appeal from that conviction and death sentence, his 1995 re-sentencing after remand, as well as his direct appeal from the second death sentence. The terms "appellate counsel" and "trial counsel" are used interchangeably throughout this Opinion. The Defender Association of Philadelphia (Defender Association) represented May before the PCRA court and continues its representation in this proceeding. Accordingly, no layering of ineffective assistance of counsel claims is required. *C.f.Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014 (2003).

action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. *Commonwealth v. Kimball,* 555 Pa. 299, 724 A.2d 326, 333 (1999) (using the test for ineffective assistance of counsel set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Counsel will not be deemed ineffective for failing to raise a meritless claim. *Commonwealth v. Tilley,* 566 Pa. 312, 780 A.2d 649 (2001).

Following Fair's disappearance in 1982, the Lancaster County Police assigned Detective Hogan to investigate the missing persons report. For more than two years, Detective Hogan compiled a report containing several statements from persons who claimed that they had seen Fair after December 19, 1982, the date on which May was arrested and incarcerated for the rape and attempted murder of G.S. and S.S. *See, e.g.,* Initial Brief of Appellant, Appendix 4 at 14 (report of interview with David James Cunningham (Cunningham), who stated that he had known Fair for eight or nine years and had observed her driving by him in September or October of 1983); *id.* at 17 (report of interview with Samuel Witherspoon (Witherspoon), who stated that he knew Fair and that she attended a party at his house in November of 1983).

During the 1991 guilt phase, trial counsel sought to introduce the Investigative Report in an attempt to demonstrate that Fair was still alive after May had been sent to jail, rendering it impossible for May to have killed her. The trial court permitted Detective Hogan to testify about the preparation of the report, but refused to allow testimony regarding the contents of the report, concluding that the individual statements contained therein were inadmissible hearsay. Notes of Testimony (N.T.), March 8, 1991, at 892–93. May assigns error to this decision, asserting that the Investigative Report is a business record and, therefore, should have been admitted as an exception to the hearsay rule.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pennsyl-

vania Rule of Evidence 801(c). Hearsay is not admissible unless a specific exception applies. Pa.R.E. 802. May points to the "business record" exception, which provides as follows:

(b) **General Rule.**—A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the tribunal, the sources of information, method and time of preparation were such as to justify its admission.

(c) **Definition.**—As used in this section **"business"** includes every kind of business, profession, occupation, calling, or operation of institutions whether carried on for profit or not.

42 Pa.C.S. § 6108.[11] May is correct in asserting that the Investigative Report is a business record and, as such, is admissible as an exception to the hearsay rule.[12] May fails to realize, however, that the admission of the Investigative Report does not automatically render the statements included therein admissible. Whether or not the Investigative Report is admissible, the statements themselves are also hearsay. Thus, the individual statements taken by Detective Hogan are "double hearsay," which are "permissible [only] if there is a [separate] hearsay exception for each statement in the chain."

**11.** *See also* Pa.R.E. 803(6).

**12.** In *Commonwealth v. Graver*, 461 Pa. 131, 334 A.2d 667 (1975), this Court held that a log of police reports was a business record for the purpose of the exception to the hearsay rule. Further, police reports are exempt from hearsay disqualification pursuant to the Public Records Statute, 42 Pa.C.S. § 6104. Justice Saylor expresses concern that any documents prepared in anticipation of litigation should not be considered a business record. Concurring Opinion of Justice Saylor at 1. Although I agree with Justice Saylor's theoretical concern, I fail to identify any cause for concern in the instant case. In *Pompa v. Hojancki*, 445 Pa. 42, 281 A.2d 886 (1971), this Court held that an expert's report, prepared specifically for litigation, was not admissible pursuant to the business records exception to the hearsay rule. Unlike the facts of *Pompa*, in the instant case the preparation of the police report appears to be routine, rather than purposefully prepared for the sole purpose of litigation. I therefore conclude that the instant matter is substantially dissimilar from *Pompa*.

*Commonwealth v. Ogrod,* 576 Pa. 412, 839 A.2d 294, 327 n. 23 (2003) (citing *Commonwealth v. Chmiel,* 558 Pa. 478, 738 A.2d 406, 417 (1999)).

May does not articulate any exception into which the statements could fall, and our review likewise reveals none. During the 1991 trial, May could have attempted to call the individuals who claimed that they saw Fair alive after December of 1982, but he did not, and he does not now contend that trial counsel were ineffective for failing to call those witnesses to testify. The presentation of direct testimony from Cunningham and Witherspoon, among others, would have alleviated the hearsay problem and would have provided the Commonwealth a full and fair opportunity to cross-examine the witnesses. Because May has not demonstrated that the trial court erred in ruling the statements contained within the Investigative Report inadmissible, appellate counsel were not ineffective for failing to appeal this ruling. *Commonwealth v. Tilley,* 566 Pa. 312, 780 A.2d 649 (2001).

In the same vein, May claims that appellate counsel were ineffective for failing to appeal the decision of the trial court to deny his attempt to present the testimony of Barbara Turner (Turner), Fair's mother-in-law, who, allegedly, would have testified that Fair left her one-year old son, Ricky Hamm (Ricky), with Turner for periods of time without telling Turner where she was going or when she would return. Trial counsel wished to call Turner to show that Fair's lifestyle was such that "she would party on weekends and she would like to go out and have a good time" without caring for or accepting responsibility for her child. N.T., March 8, 1991, at 903–06. The Commonwealth objected, asserting that the only purpose for this testimony would be to smear Fair's name. The trial court agreed and refused to allow Turner to testify in this regard, concluding that the evidence was irrelevant as "it's just as illegal to kill the devil as it is to kill a saint" and "[i]t's not legal to kill irresponsible people." *Id.* at 904, 906.

In the present PCRA filings, the Defender Association attempts to recast the proffered testimony of Turner as

relevant to rebut testimony presented by the Commonwealth that Fair had a close relationship with her son and would not leave him for long periods of time. However, a full and fair review of the record makes it clear that trial counsel sought to introduce the testimony of Turner only to disparage Fair. As aptly articulated by the trial court, the allegedly irresponsible character of the victim is not relevant to exculpate May. Accordingly, appellate counsel were not ineffective for failing to appeal the decision of the trial court to estop the questioning of Turner as it related to Fair's character. *See Tilley, supra* (holding that counsel will not be deemed ineffective for failing to raise a meritless claim).

### Issue 2—Victim Impact Testimony

May next contends that trial counsel were ineffective for failing to object to alleged victim impact statements that the prosecutor made and elicited during the guilt phase of his 1991 trial.[13] Specifically, May alleges four instances of improper victim impact argument and testimony during the trial.

First, May asserts that the prosecutor presented impermissible victim impact argument when he stated:

> [the charge of homicide] require[s] that you hear some evidence about a young lady from Lancaster who when she was twenty-two years of age had her life suddenly taken from her, and you are going to hear some testimony about her young son who hasn't been with his mother since that date, and that kind of testimony is never easy to hear.

N.T., March 6, 1991, at 491.

> Generally, a prosecutor's arguments to the jury are not a basis for the granting of a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility towards the accused which would prevent them from properly weighing the evidence and rendering a true verdict.

13. Victim impact evidence is defined in the capital sentencing statute as "evidence concerning the victim and the impact that the death of the victim has had on the family of the victim...." 42 Pa.C.S. § 9711(a)(2).

*Commonwealth v. Jones,* 546 Pa. 161, 683 A.2d 1181, 1199 (1996). A prosecutor must have "reasonable latitude in fairly presenting a case to the jury and must be free to present his or her arguments with logical force and vigor." *Commonwealth v. Brown,* 551 Pa. 465, 711 A.2d 444, 454 (1998). "The prosecutor is also permitted to respond to defense arguments. Finally, in order to evaluate whether the comments were improper, we do not look at the comments in a vacuum; rather we must look at them in the context in which they were made." *Commonwealth v. Weiss,* 565 Pa. 504, 776 A.2d 958, 968 (2001).

■ We determined in *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155, 159 (1978), that evidence introduced to result in sympathy for the victim's family, while having no direct relationship to the facts and circumstances of the crime, is impermissible during the guilt phase of trial. In this case, the age of Ricky has no correlation to the determination of whether May committed the murder. Thus, the prosecutor's statements, whether intentionally designed to elicit sympathy or not, were improper. Nevertheless, the comment was a fleeting reference and clearly did not substantially affect the outcome of the trial, as required to demonstrate the prejudice prong of an ineffective assistance of counsel claim. "Absent a demonstration of prejudice, [a PCRA petitioner] cannot prevail on a claim for ineffective assistance of counsel and no further inquiry into the claim is warranted." *Commonwealth v. Pierce,* 567 Pa. 186, 786 A.2d 203, 221 (2001) (citing *Commonwealth v. Fletcher,* 561 Pa. 266, 750 A.2d 261 (2000), *cert. denied,* 531 U.S. 1035, 121 S.Ct. 623, 148 L.Ed.2d 533 (2000)).

■ May further avers that the prosecutor acted improperly when he stated, "[n]o one ever saw her again, including her small son, and you are going to hear evidence that she was not the type of mother who would just ignore her son and go off places for long periods of time." N.T., March 6, 1991, at 499. The above quote fails to provide the context of the prosecutor's remarks. When read in its totality, the argument of the prosecutor was simply that it was reasonable for the police to assume that Fair was kidnapped and/or killed, rather than

voluntarily missing, because she did not usually leave her son for extended periods of time. Therefore, the statement was both relevant and probative, and this claim has no arguable merit.

■ May also argues that the prosecutor elicited inappropriate victim impact statements from Lisa Stern (Stern), Fair's sister, when he: (1) asked her the ages of Fair and Ricky; and (2) asked if, to her knowledge, Ricky had seen his mother since her September 4, 1982 disappearance. *Id.* at 660, 666. The initial comment of Stern was a simple statement indicating Ricky's age, not how the death of Fair affected him. Stern made the second statement not to result in empathy, but to illustrate the disappearance of Fair. While the comment may have been inapt, it was fleeting when viewed in the context of a trial that consisted of more than one-thousand pages of testimony. Even if the statement satisfies the definition of victim impact evidence, the remark was not so severe as to prejudice the jury to the point that it could not render a true and fair verdict.

■ May proposes that the testimony of Stern, indicating that Fair was a wonderful sister, and that she had a very close relationship with Fair, was designed solely to inflame the jury. *See id.* at 660. Stern's testimony provided her opinion of Fair's personal qualities. May fails to cite any law indicating that it is impermissible to comment on the qualities of the victim. Moreover, while we do not condone the remarks of the prosecutor, we cannot say that the brief reference to Fair's loving relationship with her sister was so pervasive as to unfairly prejudice the jury to the point that they could not fairly weigh the evidence presented.

Finally, May suggests that these occurrences of ineffective assistance of counsel were compounded by his inability to rebut the accuracy of Turner's testimony describing Fair's propensity for leaving her child with a babysitter for long periods of time. However, as discussed above, the proposed testimony of Turner would not have shown that Fair left Ricky for extended periods of time such that it was unreason-

able for the police to believe that, when she became missing, she would not have voluntarily disappeared. Therefore, May's claim concerning Turner is devoid of arguable merit, and he fails to demonstrate entitlement to relief on any of his victim impact issues.

*Issue 3—Alleged Bolstering of Commonwealth Witnesses*

May alleges that trial counsel were ineffective for failing to object to the testimony of Detective Wahmann insofar as Detective Wahmann commented on the qualifications of Dr. Hoffman, the Commonwealth's expert forensic pathologist. May also avers that trial counsel impermissibly failed to object to the prosecutor's questioning of Dr. Hoffman about a report prepared by Dr. Isadore Mihalakis (Dr. Mihalakis), a forensic pathologist hired by the defense, despite the fact that the defense never called Dr. Mihalakis at trial.

At trial, the following exchange between the prosecutor and Detective Wahmann took place:

Q: Why did you take [the body] to the West Reading Hospital and Medical Center?

A: To have an autopsy conducted and an examination conducted by a forensic pathologist.

Q: And who was that?

A: Dr. Neil Hoffman.

Q: Why Dr. Hoffman?

A: I am familiar with Dr. Hoffman. I have worked with Dr. Hoffman in the past and am aware of his credentials and know that he is eminently qualified and one of the foremost forensic pathologists in the Commonwealth.

N.T., March 6, 1991, at 581. May contends that the questioning of Detective Wahmann constituted impermissible bolstering of a Commonwealth witness because Detective Wahmann's testimony encroached on the jury's province to determine the credibility of Dr. Hoffman.

"It is well settled that as long as a prosecutor does not assert his personal opinions, he or she may, within reasonable limits, comment on the credibility of a Commonwealth

witness. This is especially true when the credibility of the witness has been previously attacked by the defense." *Commonwealth v. Miller*, 572 Pa. 623, 819 A.2d 504, 516 (2002) (quoting *Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621, 639 (1995)). Expert testimony cannot be used by the Commonwealth to encroach on the jury's right to determine the credibility of witnesses. *Commonwealth v. Gallagher*, 519 Pa. 291, 547 A.2d 355, 357 (1988). In the matter at hand, the prosecutor did not assert his personal opinion regarding Dr. Hoffman's credibility, nor did Detective Wahmann vouch for the credibility of the physician. The detective merely indicated that he brought the body to Dr. Hoffman because Dr. Hoffman was a well-qualified forensic pathologist. Therefore, May has failed to demonstrate arguable merit to support his ineffectiveness claim.

As to the testimony of Dr. Hoffman, referencing the report of Dr. Mihalakis, which had been prepared for the defense and provided to the prosecution during discovery, May fails to articulate how the prosecutor's questioning of Dr. Hoffman regarding the similarities in the two reports constitutes improper bolstering of Dr. Hoffman. The Commonwealth was free to question its expert about the report, and the defense was free to cross-examine Dr. Hoffman about it and any areas in which Dr. Mihalakis' conclusions differed from his own. Accordingly, May cannot establish that his trial counsel rendered ineffective assistance in this regard.

### *Issue 4—Impeachment of Jailhouse Informant*

May asserts that he is entitled to a new trial because appellate counsel were ineffective for failing to argue on appeal that the trial court erroneously restricted defense counsels' cross examination of jailhouse informant Neidig. As indicated above, while both were incarcerated at the State Correctional Institution (SCI) Huntingdon, May indicated to Neidig that the police were going to be able to "put a body on him" and that he "did it." N.T., March 7, 1991, at 850–51. Counsel for May sought to impeach Neidig's credibility by introducing a 1971 armed robbery conviction. The trial court

forbid such impeachment, determining that robbery was not *crimen falsi. Id.* at 693–96.

The applicable rule of evidence provides as follows:

(a) **General Rule.**—For the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime ... shall be admitted if it involved dishonesty or false statement.

(b) **Time limit.**—Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date[.] [14]

Pa.R.E. 609. The trial court erred in concluding that robbery is not a *crimen falsi* offense. *Commonwealth v. Yarris*, 519 Pa. 571, 549 A.2d 513, 521 (1988). However, no evidence of this crime could be used in the cross-examination of Neidig because Neidig had been released from prison for the armed robbery more than ten years prior to the trial of May. [15] Accordingly, this argument is without merit. Appellate counsel cannot be deemed ineffective for failing to raise a meritless issue on appeal. *Commonwealth v. Tilley*, 566 Pa. 312, 780 A.2d 649 (2001).

Having concluded that none of May's guilt-phase issues necessitates a grant of relief, we turn to his penalty phase claims. We first address those claims that, if proven, would have entitled May to an automatic sentence of life imprison-

14. The Court recognizes that Pa.R.E. 609(b) requires that courts utilize a balancing test to determine whether the interests of justice demand the admissibility of convictions falling outside of the ten-year period. However, because May's argument in this case invokes only the *per se* rule of admissibility, we will not engage in this balancing test. *See* Brief of Appellant at 95–7.

15. While the criminal records of Neidig were not entered into evidence during trial and, therefore, we do not have access to them, the trial court and the prosecution both stated on the record that Neidig had been out of prison on this charge for more than ten years, and defense counsel did not quarrel with this finding. *See* N.T., March 7, 1991, at 693–97. Moreover, in his PCRA Petition and instant appeal, May does not allege that Neidig had not been out of prison for more than ten years on the armed robbery conviction as of March 7, 1991.

ment. Because neither of these claims have merit, we then turn to the claim on which we ultimately grant relief in the form of a new penalty phase.

### Issue 5—Double Jeopardy

 May next argues that trial counsel were ineffective for failing to argue that the jury's determination, in his first sentencing proceeding, that he had no significant history of criminal convictions, estopped the Commonwealth from proving that aggravating circumstance during the second sentencing hearing. Specifically, May asserts that because the 1991 sentencing jury rejected the significant history aggravating circumstance, 42 Pa.C.S. § 9711(d)(9), and specifically found that he had no significant history of prior criminal convictions, 42 Pa.C.S. § 9711(e)(1), the 1995 re-sentencing jury should have been estopped from finding the significant history aggravator and rejecting the no significant history mitigator.

In *Poland v. Arizona*, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986), the United States Supreme Court rejected the argument that a capital sentencer's refusal to find a particular aggravating circumstance alleged by the prosecution always constitutes an "acquittal" of that aggravating circumstance for double jeopardy purposes. *Id.* at 155, 106 S.Ct. 1749. The Court explained that it was not prepared to view the capital sentencing hearing as a set of mini-trials. *Id.* at 156, 106 S.Ct. 1749. Aggravating circumstances are not separate penalties or offenses, but are "standards to guide the making of [the] choice" between the alternative verdicts of death and life imprisonment. *Bullington v. Missouri*, 451 U.S. 430, 438, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981). This Court has followed the reasoning of *Poland*, noting that:

it is not the finding of the presence or absence of an aggravating circumstance that is dispositive of whether the defendant will receive the death penalty, but rather it is the ultimate conclusion reached after the factfinder weighs all the factors found, both aggravating and mitigating. . . . When a jury has imposed a death penalty in a first trial, double jeopardy does not attach no matter what aggravating

circumstances were found by the jury in the first trial or what aggravating circumstances are presented to the jury in the second trial.

*Commonwealth v. Gibbs,* 533 Pa. 539, 626 A.2d 133, 136–37 (1993).

May avers that his case is distinguishable from *Gibbs* because the 1991 sentencing jury specifically found that he had no prior history of criminal convictions. Brief for Appellant at 64 n. 54. Yet, his position ignores the reasoning of *Gibbs* and *Poland* that double jeopardy does not attach in such situations, regardless of what mitigator and/or aggravators were or were not found in the first and second sentencing proceedings.

Although not raised by either May or the Commonwealth, it is worth noting that the United States Supreme Court stated, albeit in *dicta*, that "if [a] petitioner's first sentencing jury had unanimously concluded that Pennsylvania failed to prove any aggravating circumstances, that conclusion would operate as an 'acquittal' of the greater offense ... bar[ring] Pennsylvania from ... [re-]seeking the death penalty." *Sattazahn v. Pennsylvania,* 537 U.S. 101, 112, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003). While this language may initially appear to provide some support for May's claim of entitlement to relief, *Sattazahn* is inapposite to the instant matter. *Sattazahn* speaks to the situation where the original jury did not find **any** aggravating circumstances, and, thus, the sentence of life imprisonment was statutorily mandated. In May's 1991 sentencing hearing, while the jury did not unanimously find the (d)(9) aggravating circumstance, nevertheless, it did find the (d)(6) aggravating circumstance, that May committed the murder while in the perpetration of another felony.[16]

16. In overturning the original death sentence on direct appeal, this Court concluded that the jury could not have found the predicate felony of rape alleged by the Commonwealth because the court never instructed the jury on the elements of rape. Anticipating the potentiality of the circumstance presently before us, and the effect of 42 Pa.C.S. § 9711(h)(4), which provides a mandatory life sentence if none of the aggravating circumstances found are supported by sufficient evidence, our Court stated as follows:

Moreover, sentencing juries in this Commonwealth do not reject aggravating circumstances unanimously; rather, unless the jury finds an aggravator unanimously, it is discarded. Thus, no sentencing proceeding in Pennsylvania can ensure a unanimous decision against any specific aggravator, let alone all aggravators presented by the Commonwealth. Accordingly, the trial court correctly determined that the Commonwealth could pursue the "significant history of felony convictions using the threat of violence" aggravating circumstance. Because the trial court correctly decided this issue, appellate counsel were not ineffective for failing to raise it on appeal.

### *Issue 6—Constitutionality of (d)(9) Aggravating Circumstance*

 May next claims that 42 Pa.C.S. § 9711(d)(9) [17] is unconstitutionally vague, both facially and as applied, because the term "significant history," as used in this aggravating circumstance, is not defined under Pennsylvania law. Because counsel for his trial, sentencing hearings, and direct appeals never raised the claim, May alleges ineffective assistance. Both this Court and the United States Supreme Court have addressed the substance of the claim, finding it meritless. The U.S. Supreme Court analyzed a vagueness claim against a portion of the death penalty statute of the State of California, which states, "in determining the penalty, the trier of fact shall take into consideration ... the presence or absence of criminal activity by the defendant which involves the use or

> We wish to state clearly that in reaching this conclusion, our decision should not be interpreted as a finding that the aggravating circumstance (the killing was committed during the commission of a felony) is not supported by sufficient evidence. Rather, we emphasize that our conclusion is based on the rationale that the jury erred in considering the wrong felony to support its finding that the killing was committed during the commission of a felony. In fact, we cannot 'review' the sufficiency of the evidence to support a finding of rape since the Commonwealth never attempted to present such evidence or prove the crime of rape.
>
> *May I,* 656 A.2d at 1345.

17. This section of the sentencing statute states that "[a]ggravating circumstances shall be limited to the following: [t]he defendant has a significant history of felony convictions involving the use or threat of violence to the person." 42 Pa.C.S. § 9711(d)(9).

attempted use of force or violence or the express or implied threat to use force or violence." *Tuilaepa v. California,* 512 U.S. 967, 969, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994); Cal.Penal Code Ann. § 190.3(b). In upholding the statute, the U.S. Supreme Court stated:

> [This aggravating circumstance] is phrased in conventional and understandable terms and rests in large part on a determination whether certain events occurred, thus asking the jury to consider matters of historical fact.... Both a backward-looking and forward-looking inquiry are a permissible part of the sentencing process ... and the States have considerable latitude in determining how to guide the sentencer's decision in this respect. Here, [the challenged aggravator] is not vague.

*Tuilaepa,* 512 U.S. at 976–77, 114 S.Ct. 2630.[18]

It is noteworthy that the statutory language upheld in *Tuilaepa* is less restrictive than the language in the Pennsylvania statute. Specifically, the California statute stated that the "presence" of "criminal activity" could constitute an aggravating circumstance. The Pennsylvania statute requires more than a mere presence of such activity; rather, it requires a "significant history." Similarly, the California statute allows any "criminal activity" to trigger the aggravating factor; the Pennsylvania law demands "felony convictions." It is clear to this Court that where the less demanding standard of the California statute is constitutional, the same must be true of the statute in the case *sub judice.* Because May has failed to demonstrate how the Pennsylvania statute is unconstitutionally vague, we find his contention wholly without merit.

■ In asserting that the (d)(9) aggravator is unconstitutionally vague as applied, May does nothing more than present that bald statement. His argument only attacks the statute as a whole, without indicating how it might be unconstitutionally applied to him while constitutionally applied to others. Be-

---

18. On many occasions, this Court has followed the reasoning expressed by the U.S. Supreme Court. *See, e.g., Commonwealth v. Williams,* 557 Pa. 207, 732 A.2d 1167 (1999); *Commonwealth v. Fahy,* 512 Pa. 298, 516 A.2d 689, 698 (1986).

cause May's argument that this portion of the sentencing statute is unconstitutional is wholly unsupported, he fails to demonstrate arguable merit, and, therefore, counsel cannot be deemed ineffective. *Commonwealth v. Tilley,* 566 Pa. 312, 780 A.2d 649 (2001).

### Issue 7—Evidence of Early Childhood Abuse

May posits that appellate counsel were ineffective for failing to challenge the decision of the trial court during the 1995 re-sentencing proceeding that the mitigation evidence May wished to present regarding the abuse perpetrated on him by his father was irrelevant and inadmissible. Specifically, May wanted to present evidence that his father physically and sexually abused him, and forced him to watch as his father physically and sexually abused his sisters and mother. In fact, the Commonwealth conceded before the PCRA court that May had been "physically struck or threatened with physical harm" by his father and that his father "was a cruel and abusive man who controlled his family by keeping them isolated and by keeping them at his mercy financially." Commonwealth's Response to Appellant's Proposed Findings of Fact and Conclusions of Law at 1–2 (Original Record No. 273). May wished to present this evidence regarding his father pursuant to 42 Pa.C.S. § 9711(e)(8) (subsection (e)(8)), which includes as a mitigating circumstance "any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." This mitigating circumstance is often called the "catchall" mitigator.

The Commonwealth asserted that the use of a conjunctive by the legislature in subsection (e)(8) [19] limited the admissible mitigation evidence to that which addressed **both** character and record. The Commonwealth believed that this interpretation rendered May's proffered evidence irrelevant and objected to its admission. The trial court doubted whether the proposed evidence fit into one of the mitigating factors set

19. "any other evidence of mitigation concerning the **character and record** of the defendant and the circumstances of his offense ..." 42 Pa.C.S. § 9711(e)(8) (emphasis added).

forth in the statute, and sustained the Commonwealth's objection to admission of any such evidence. N.T., Dec. 1, 1995, at 30–31. We disagree with the ruling of the trial court. Not only is such evidence relevant, its presence is a necessary component of a fair and complete sentencing proceeding. We hold that the failure of trial counsel to object to such an egregious mistake by the trial court constitutes ineffective assistance of counsel from which May suffered prejudice.

As discussed, *supra,* at 193–94, 898 A.2d at 564, in order to prove counsel ineffectiveness, a defendant must establish that: (1) the underlying claim has arguable merit; (2) counsel had no reasonable basis for his choice; and (3) but for counsel's errors, there is a reasonable probability that the outcome would have been different. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987). In order to analyze properly May's ineffectiveness claim, however, we must first review the history of mental and physical abuse as a mitigating factor.

The United States Supreme Court has long held that ensuring justice involves the presentation of evidence detailing the childhood of a defendant as a mitigating factor in the process of determining whether to impose the death penalty. *Pennsylvania v. Ashe,* 302 U.S. 51, 55, 58 S.Ct. 59, 82 L.Ed. 43 (1937) ("justice generally requires consideration of more than the particular acts ... [it also necessitates] tak[ing] into account the circumstances of the offense together with the character and propensities of the defendant"). In *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the United States Supreme Court explained that the entity charged with sentencing the defendant should not be precluded from considering, in mitigation, evidence of a defendant's childhood, upbringing, and emotional disturbances. *See id.* at 113–15, 102 S.Ct. 869. "Evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation." *Id.* at 115, 102 S.Ct. 869; *accord McGautha v. California,* 402 U.S. 183, 187–188, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971). While the Court recognized that in certain circumstances, "such evidence properly may be given

little weight," specifically dependent upon the age of the defendant at the time of the offense,[20] nevertheless "evidence of a turbulent family history, of beatings by a harsh father, and of severe emotional disturbance" is relevant. *Id. See also Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ("the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, **as a mitigating factor**, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death").

Further, a unanimous court stuck down a death sentence where the jury was precluded from considering mitigation evidence that did not fall within the elements of mitigation specifically set forth in the state statute at issue. *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). In *Hitchcock*, the defense presented evidence of the defendant's inhalation of gas fumes, the poverty of his family, and unfortunate circumstances of his upbringing. *Id.* at 397, 107 S.Ct. 1821. The trial court, however, limited the evidence available to the jury for consideration to the statutorily defined mitigating circumstances, which did not include this type of evidence. The United States Supreme Court ruled that this functional exclusion of evidence did not comport with the requirement of *Eddings*.

The United States Supreme Court's recent decision in *Wiggins v. Smith*, 539 U.S. 510, 534–37, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), adds further support to this line of cases. In *Wiggins*, the United States Supreme Court held that inadequate investigation of the history of the defendant for the purposes of developing mitigation evidence for the penalty phase of a capital murder trial prejudiced the defendant; had counsel done his research, he would have uncovered that the defendant experienced "severe privation and abuse" in the early years of his life while in the custody of his alcoholic, absentee mother, and had suffered physical torment, sexual

---

**20.** May was twenty-four years old at the time of the offense, while Eddings was sixteen.

molestation, and repeated rape during years of foster care. *C.f. Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

This Court has also long recognized that it is of paramount importance that juries have knowledge of a defendant's childhood when deciding whether to impose the death penalty. *See Commonwealth v. Moody,* 476 Pa. 223, 382 A.2d 442 (1977); *Commonwealth v. Green,* 396 Pa. 137, 151 A.2d 241 (1959). Not only have we focused on the availability of such mitigation evidence to the jury, we have also held that the breadth of such evidence is almost unlimited. *Commonwealth v. Holcomb,* 508 Pa. 425, 498 A.2d 833, 856 (1985) (ruling that "our statute steers a course between the rock of draconian imposition and the whirlpool of discrimination by requiring death for narrowly defined aggravating circumstances, but allowing an almost unlimited presentation and consideration of mitigation circumstances . . . .").

These series of federal and state cases make abundantly clear that mitigation evidence is not merely admissible, but rather is vital to a fair sentencing procedure. Further, state and federal case law demonstrate that the scope of such evidence is not limited to those examples detailed within the relevant statute. In the case before us, May had a right as a matter of both state and federal law to present the evidence of his abusive and traumatic childhood as mitigation at his sentencing hearing.[21] Therefore, his underlying claim has arguable merit.

We now look at the second prong, in which we decide if counsel's decision to forego bringing this claim was reasonable. May contends that trial counsel's strategy not to raise "too many issues" was unreasonable. May notes that trial counsel stated at the PCRA hearing that he would raise as many as five issues that had merit, but that in the end he deemed only two issues worthy of appeal. N.T. April 9, 2002,

21. Nowhere does this Opinion state, as Justice Castille's concurrence claims, that counsel "is obliged" to present such evidence. Instead, we noted the important role such evidence plays in sentencing and allowed

at 25. Thus, as a matter of strategy, trial counsel did not choose to forego some claims that he believed had merit. Instead, May avers, trial counsel's failure to raise this issue is evidence that his representation of May was incompetent.

According to a plurality of this Court, "appellate counsel is not constitutionally obliged to raise every conceivable claim for relief. Counsel may forego even arguably meritorious issues in favor of claims which, in the exercise of counsel's objectively reasonable professional judgment, offered a greater prospect of securing relief." *Commonwealth v. Jones*, 572 Pa. 343, 815 A.2d 598, 613 (2002) (Opinion Announcing the Judgment of the Court per Castille, J., joined by Eakin, J.). Others have expressed a belief that counsel can never be effective in failing to raise a meritorious claim:

> When appellate counsel fails to advance an issue that would, if raised, have entitled his or her client to a new trial, or a new sentencing hearing in a capital case, I simply cannot see how this strategy would ever be reasonable. Although I realize that trial lawyers, in arguing a case to a jury, often forego meritorious objections for a variety of strategic reasons (for example, not wishing to confuse the jury on a technical issue, the possibility of defense theories appearing to conflict, credibility with the jury, etc.), appellate litigation presents entirely different considerations.

* * *

> In brief, if the underlying claim of error is of such an important magnitude that it would have entitled a defendant to relief had it been raised on appeal, there can be no justification for the failure of appellate counsel to pursue the claim that would ever qualify as a reasonable professional judgment.

*Id.* at 619 (Newman, J., concurring). However, because the majority of our Court has not accepted either position, we continue to analyze this claim for the reasonableness of counsel's decision to forego raising this claim.[22]

for its consideration. *See* Concurring Opinion at 219, 898 A.2d at 580 (Castille, J.).

**22.** Justice Castille, in his Concurring Opinion, gives the impression that the view I expressed while concurring in *Jones* renders any appellate

212

As May correctly observes, trial counsel's testimony at the PCRA hearing demonstrates that his failure to present evidence of May's childhood abuse was either a failure to identify the trial court's error or a failure to recognize the merit in objecting to the trial court's determination. There was no strategy involved. As trial counsel himself admitted, he had no strategy regarding this issue. N.T. April 9, 2002, at 25. We are therefore constrained to reason that a complete lack of strategy cannot constitute a reasonable basis for a decision not to raise a claim. Thus, we conclude that May has established the second component of ineffective assistance of counsel.

Turning to the prejudice prong of the ineffective assistance of counsel test, the defendant must demonstrate that but for counsel's ineffectiveness, there is a reasonable probability that the result would have been different. *Pierce, supra.* This Court has previously held that the failure to present a history of abuse is prejudicial. *See Commonwealth v. Ford,* 570 Pa. 378, 809 A.2d 325, 334 (2002) (holding that defendant was prejudiced by failure to present history of abuse and mental illness); *Commonwealth v. Perry,* 537 Pa. 385, 644 A.2d 705, 709 (1994) (failure to present evidence in mitigation prejudiced defendant). *C.f. Wiggins,* 539 U.S. at 537, 123 S.Ct. 2527.[23]

counsel *per se* ineffective, without a consideration of reasonableness, when he foregoes raising a meritorious claim. His representation of my position in *Jones* is skewed. That opinion does not fail to consider counsel's reasonableness; rather, it simply concludes that in any scenario where counsel fails to raise a meritorious claim should be viewed as presumptively unreasonable if it would have entitled a defendant to relief had it been raised on appeal. Justice Castille's misconstruction of my position creates an inaccurate understanding of the views delineated in my concurring opinion.

23. We are mindful of the fact that a plurality of this Court have has indicated that "[i]t may be that upon hearing evidence of [a defendant's] appalling background, jurors might decide that [he or] she is incapable of rehabilitation, and deserving of the harshest punishment available." *Commonwealth v. Rivers,* 567 Pa. 239, 786 A.2d 923, 930 n. 5 (2001) (Opinion Announcing the Judgment of the Court, per Flaherty, J.). However, in the present case, May specifically sought to introduce this evidence and was effectively precluded from doing so by the ruling of the trial court. Therefore, May had chosen to risk exposing the jury to this evidence.

In the case *sub judice*, it is this Court's judgment that May suffered prejudice. The jury in May's second sentencing hearing found only one aggravating circumstance—a significant history of felony convictions involving the use or threat of violence to the person. The jury was bound to impose the death penalty because it found no mitigating circumstances.[24] *See* 42 Pa.C.S. § 9711(c)(1)(iv). Had May established this "catch all" mitigating factor by a preponderance of the evidence, the jury would have been free to award a sentence of life imprisonment rather than death. Had trial counsel presented evidence of mitigation, the jury would have weighed the contested aggravating factor against the strong evidence of abuse suffered by May. Keeping in mind the recent instances where this Court has found prejudice in similar cases, we are satisfied that the likelihood of a different outcome is reasonable, and that May therefore suffered prejudice where trial counsel failed to object when the trial court would not admit such evidence. Accordingly, May has established that his counsel was ineffective. He is therefore entitled to relief on this claim.

### Issue 8—Cumulative Error

The final argument of May is that the cumulative effect of the errors alleged herein denied him a fair trial. As we are remanding this case for a new penalty phase, we will address this contention only as it relates to the guilt phase. We have held that "no number of failed claims may collectively attain merit if they could not do so individually." *Commonwealth v. Williams*, 532 Pa. 265, 615 A.2d 716, 722 (1992). Because we have determined that there were no guilt phase errors warranting relief, May's allegation fails.

24. As noted *supra*, at 192, 898 A.2d at 563, this Court determined that the jury could not properly consider whether May committed murder while in the perpetration of a rape because the court never instructed the jury on the elements of rape. *May I*, 656 A.2d at 1344–1345. Therefore, during his second sentencing hearing, the aggravating factor for committing a killing while perpetrating a felony, 42 Pa.C.S. § 9711(d)(6), was not available.

## CONCLUSION

We affirm the decision of the PCRA court as it relates to May's claims arising from the guilt phase of his original trial. However, because we have determined that appellate counsel were ineffective for failing to appeal the decision of the trial court, during the 1995 re-sentencing, that evidence of May's childhood abuse could not be admitted pursuant to 42 Pa.C.S. § 9711(e)(8), we vacate the Judgment of Sentence and remand this matter to the Court of Common Pleas of Lebanon County for re-sentencing.

Justice BAER and Justice BALDWIN join the opinion.

Justice CASTILLE files a concurring opinion in which Chief Justice CAPPY and Justice EAKIN join.

Justice SAYLOR files a concurring opinion.

Justice CASTILLE, concurring.

I join the Majority Opinion without qualification in its treatment of Issues 2, 4, 5, 6, and 8. I concur in the result as to Issues 1 and 3, as I share some, but not all, of the concerns articulated in Mr. Justice Saylor's Concurring Opinion. I also agree that appellant is entitled to penalty phase relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq.*, on his seventh claim, to wit, that his appellate counsel were ineffective in failing to challenge the trial court's ruling that evidence relating to childhood abuse he suffered at the hands of his father was inadmissible. I write separately on Issue 7, however, because I do not entirely agree with the Majority's constitutional analysis of this claim, including its ultimate and inapposite finding that counsel's trial perform-ance, and not their appellate performance, was deficient. In my view, a proper resolution of this claim requires a more thorough and nuanced approach, which I attempt to set forth below. In addition, I respectfully disagree with some broad preliminary observations the Majority makes which suggest that evidence concerning a capital defendant's childhood must

 

be introduced as mitigation evidence at the penalty phase of a capital trial.

## I. The Appropriate Sixth Amendment Standard of Review.

In its seminal decision in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the U.S. Supreme Court stressed that, "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689, 104 S.Ct. 2052. This is so because it is "all too tempting" for a defendant to second-guess counsel, and "all too easy" for a court to deem a particular act or omission unreasonable merely because counsel's overall strategy did not achieve the result his client desired. *Id. See also Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (*Strickland* Court adopted "the rule of contemporary assessment" because it recognized that "from the perspective of hindsight there is a natural tendency to speculate as to whether a different trial strategy might have been more successful"); *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir.1995) ("nothing is clearer than hindsight—except perhaps the rule that we will not judge trial counsel's performance through hindsight"). *Accord Commonwealth v. Bond*, 572 Pa. 588, 819 A.2d 33, 51 (2002).

Citing to separate opinions filed in this Court's non-majority decision in *Commonwealth v. Jones*, 572 Pa. 343, 815 A.2d 598 (2002), the Majority suggests that there are competing approaches to the Sixth Amendment standard for assessing claims of ineffective assistance of appellate counsel. The Majority then quotes at length from Madame Justice Sandra Newman's Concurring Opinion in *Jones* for the absolute, bright-line proposition that appellate counsel "can never be effective in failing to raise a meritorious claim." Majority op. at 211, 898 A.2d at 575. That broad test, as stated, apparently would deem irrelevant any consideration of the reasonableness

of counsel's actual performance: if the appellate claim seemed to have merit in hindsight, appellate counsel would be deemed *per se* ineffective. In resolving the instant claim, however, the Majority ultimately does not employ the *per se* approach of the *Jones* concurrence, but instead, very briefly discusses appellate counsel's PCRA testimony and concludes that, because counsel articulated no strategic reason for failing to raise the claim at issue on appeal, the performance prong of the *Strickland* test is satisfied.

In my view, the question of the appropriate standard for assessing claims of appellate counsel has been answered by the the U.S. Supreme Court, which has made clear that the *Strickland* performance and prejudice test governs Sixth Amendment claims concerning appellate performance. Moreover, the High Court has recognized the special considerations which govern a review of the reasonableness of decisions by appellate counsel. That authority has been summarized as follows:

> To prove [appellate counsel] ineffective under the Sixth Amendment, PCRA counsel would have had to prove not only the underlying merit of each waived claim ... but satisfy the entire *Strickland* standard. *Smith v. Robbins,* 528 U.S. 259, 289, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) (petitioner "must satisfy both prongs of the *Strickland* test in order to prevail on his claim of ineffective assistance of appellate counsel"); *Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). Moreover, ... even identifying an issue of "arguable" merit does not prove that appellate counsel acted unreasonably, or that prejudice ensued. This is so because, as the U.S. Supreme Court has recognized, appellate counsel is not constitutionally obliged to raise every conceivable claim for relief. Counsel may forego even arguably meritorious issues in favor of claims which, in the exercise of counsel's objectively reasonable professional judgment, offered a greater prospect of securing relief. *Jones v. Barnes,* 463 U.S. 745, 750–54, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *see also Robbins,* 528 U.S. at 288, 120 S.Ct. 746, 145 L.Ed.2d 756 ("[A]ppellate counsel

... need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."). "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of counsel be overcome." *Gray v. Greer,* 800 F.2d 644, 646 (7th Cir.1986) (quoted with approval in *Robbins,* 528 U.S. at 259, 120 S.Ct. 746, 145 L.Ed.2d 756).

\* \* \*

The High Court has explicitly recognized that appellate counsel is **not** constitutionally obliged to raise any and all nonfrivolous claims; to the contrary, the Court has, on repeated occasions, emphasized that vigorous, effective appellate advocacy requires the exercise of reasonable selectivity in deciding upon which claims to pursue. *Robbins,* 528 U.S. at 288, 120 S.Ct. 746, 145 L.Ed.2d 756; *Barnes,* 463 U.S. at 750–54, 103 S.Ct. 3308, 77 L.Ed.2d 987. "This process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith,* 477 U.S. at 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (quoting *Barnes,* 463 U.S. at 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987). *See also Buehl v. Vaughn,* 166 F.3d 163, 174 (3d Cir.1999) [ (per Alito, J.) ] ("One element of effective appellate strategy is the exercise of reasonable selectivity in deciding which arguments to raise."). *Barnes* emphasized that "[t]here can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review." 463 U.S. at 752, 103 S.Ct. 3308, 77 L.Ed.2d 987.

*Jones,* 815 A.2d at 613, 614 (Opinion Announcing Judgment of Court by Castille, J.).

I recognize that focusing on an academic and non-contextual consideration of issues as theoretical absolutes would certainly streamline the inquiry; but such an approach would violate the constitutional standard and ignore the reality of appellate

advocacy. Appellate claims do not arise in the abstract; they arise from the concrete, ever-changing circumstances attending actual cases. Any lawyer with a modicum of appellate litigation experience knows that appellate court decisions in all but the most routine of appeals are unpredictable. I do not indulge the fiction that appellate judges merely reveal immutable and indisputable truths awaiting a proper caption for exposure of these truths. Jurisprudential principles and standards emerge from the crucible of fact-bound litigation of actual cases and controversies, and the ultimate resolution often still may prove debatable among reasonable jurists. No matter how confident, or how unsure, an appellate advocate is in the claims he has raised, he will find that they indeed proved meritorious, or not, only upon receipt of the court's opinion(s) and a counting of the votes. It is not uncommon for a lawyer to find himself vindicated on an issue at trial, rejected on post-verdict motions, vindicated again on direct appeal, then rejected again on discretionary appeal. It is not uncommon that the most brilliant, focused and novel appellate arguments suffer through multiple rejections before finally being accepted.

In short, there are strategic decisions to be made by counsel on appeal, no less than at trial. An analysis of the performance of appellate counsel must assess the actual reasonableness of counsel's performance in light of the contemporaneous real-world concerns which framed their advocacy.

## II. Analysis of Counsel's Performance Under *Strickland*.

The Majority begins its analysis of Issue 7 with a lengthy discussion of the evolving role of childhood evidence as mitigation in a capital sentencing proceeding. Majority op. at 207–10, 898 A.2d at 573–74. Respectfully, in my view, the Majority misapprehends the scope of the relevant authority. The governing precedent on this point cited by the Majority stands only for the proposition that childhood evidence offered at the penalty phase in mitigation is admissible when relevant to the defendant's character or record. *See, e.g., Eddings v. Oklahoma*, 455 U.S. 104, 114, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)

(sentencer may not "refuse to consider, *as matter of law,* any relevant mitigating evidence"); *Lockett v. Ohio,* 438 U.S. 586, 608, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (statute that precluded sentencer from considering relevant mitigating factors held unconstitutional). Thus, a court cannot exclude such relevant evidence **if proffered by** the defendant.

This authority concerning the relevance and admissibility of evidence, however, does not support the Majority's overbroad *dicta* suggesting that childhood evidence is "an essential component" of the penalty process, or that it is of "paramount importance" to apprise the jury of the circumstances of the defendant's childhood, or that it is "vital to a fair sentencing procedure." The fact that the U.S. Supreme Court deems such evidence to be **relevant,** and thus teaches that courts should not exclude it when proffered by the defense, does not mean that a defendant, or his counsel, is **obliged** to forward childhood information. *See Wiggins v. Smith,* 539 U.S. 510, 535, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (finding counsel ineffective for failing to adequately investigate defendant's background, though not suggesting that results of thorough investigation must be presented). Indeed, a defendant could waive the presentation of such evidence; or, counsel could avoid childhood evidence if, in counsel's reasonable professional judgment, counsel concludes that it would not advance the defense case. Childhood evidence can be a double-edged sword; some things about a defendant's childhood obviously may weigh in favor of returning a death sentence. The fact that childhood evidence is admissible, in short, does not mean it is required, and the Majority is mistaken in suggesting otherwise.

In any event, the case *sub judice* does not involve the circumstance covered by the Majority's *dicta,* but rather, a claim of ineffective assistance on appeal in failing to challenge the court's penalty phase ruling on the admissibility of defense evidence in mitigation. When appellant's claim is properly considered under the *Strickland* standard, I am constrained to conclude that he is entitled to penalty phase relief under existing law. To properly assess counsel's appellate perform-

ance in this case requires an understanding of the context of the resentencing proceeding and its appeal which are at issue. On direct appeal, this Court upheld appellant's conviction, but remanded for a new sentencing proceeding. We noted that the jury had been charged with two aggravating circumstances—that the killing was committed while in the perpetration of a felony, that felony being attempted rape,[1] and that appellant had a significant history of felony convictions involving the use or threat of violence.[2] The jury found only the first aggravating circumstance, also found a single mitigating circumstance, and then found that the aggravator outweighed the mitigator, which required a sentence of death. This Court, in an opinion by Mr. Justice (now Chief Justice) Cappy, held that the aggravating circumstance found by the jury was compromised because the jury's verdict slip stated that it found that the felony appellant committed during the killing was rape (on which it was not charged) rather than attempted rape (on which it was charged). Because the jury found a felony aggravator that was not charged, we vacated and remanded for resentencing, being careful to note that we were not passing upon the sufficiency of the evidence to support the charged aggravator. *Commonwealth v. May*, 540 Pa. 237, 656 A.2d 1335, 1344–45 nn. 9–13 (1995).[3]

On remand, the Commonwealth provided notice of its intention to seek the death penalty based upon the same two aggravating circumstances ((d)(6) and (d)(9)) which it had pursued at the initial sentencing proceeding. Appellant's counsel moved to prohibit consideration of the (d)(6) aggravator, arguing that the trial evidence was insufficient to prove attempted rape. The trial court agreed and granted the motion on November 30, 1995.

The next day, December 1, 1995, the trial court held a hearing during which the parties discussed the most efficient

1. 42 Pa.C.S. § 9711(d)(6).

2. 42 Pa.C.S. § 9711(d)(9).

3. This Justice dissented, viewing the jury foreperson's lay mistake in failing to qualify "rape" with the word "attempted" as harmless error at most. *Id.* at 1345–46 (Castille, J., dissenting).

way to proceed. The prosecutor noted that the new jury had to be given some sense of the underlying facts, and that he had considered presenting live witnesses to "give the jury a flavor" of what had occurred at trial, but felt that the court's exclusion of the attempted rape aggravator precluded that option. The prosecutor suggested that the court could apprise the jury of the factual background of the case by reading the same synopsis of the trial evidence which it had provided prior to charging the guilt phase jury, and then note that the guilt phase jury had found appellant guilty of first degree murder. Appellant's counsel agreed to this course of action, which kept live testimony concerning the guilt phase from being introduced before the new jury. N.T. 12/1/95 at 2–4, 11–12. By this procedural agreement, the new jury, for example, would not hear the live testimony of two young women (15 year-old G.S. and 19 year-old S.S.), whom appellant had viciously assaulted soon after murdering Kathy Lynn Fair, the victim in this case. Like Ms. Fair, G.S. and S.S. were repeatedly stabbed by appellant; in addition, appellant raped S.S., and he then left the two girls for dead near the same location where he had murdered Ms. Fair. Evidence of the December 1982 crimes against G.S. and S.S. were introduced at the guilt phase as signature crimes; this Court upheld the admissibility of that testimony on direct appeal. *See Commonwealth v. May,* 656 A.2d at 1340–41.

The discussion then turned to expected penalty phase evidence. The defense stipulated to the Commonwealth's proof regarding the remaining aggravating circumstance, *i.e.,* appellant's criminal record arising from the December 1982 attacks on G.S. and S.S. N.T. 12/1/95 at 13–14. With respect to mitigation evidence, defense counsel asked the court whether, if appellant were to present evidence concerning his character, work history, and conduct in prison, the Commonwealth would be permitted rebuttal. The court ruled that it would allow evidence of bad character so long as it was "appropriate rebuttal to evidence of positive character if that is offered by [appellant]." Defense counsel next broached the subject of calling appellant's mother to testify concerning events in his

childhood, to his "intellectual age" as opposed to his "chronological age," and to his educational level. The prosecutor stipulated to appellant's chronological age. The court then noted that it would permit competent evidence "on the intellectual capabilities of [appellant]" and that it did not deem such to be character evidence subject to the Commonwealth's bad character rebuttal evidence. *Id.* at 15–18, 20, 25, 28–29.

The discussion then returned to evidence concerning appellant's childhood, and specifically, his treatment at the hands of his father. Appellant's proffer concerned evidence that his father was very domineering; that he beat his children with a belt leaving welts on them; and that he forced appellant to observe sexual conduct performed by his mother and sister, at the same time being told that he would be beaten if he told anybody about it. The trial court indicated that it did not see such "bad childhood" evidence fitting into any of the eight enumerated mitigating circumstances, and noted that it would sustain a Commonwealth objection to such evidence. Defense counsel then met with the prosecutor separately, and afterward informed the court that they had decided not to call witnesses at the penalty phase, but instead, would rely upon the stipulations concerning appellant's age and his prior record. *Id.* at 18–21, 29–32.

A penalty phase jury was selected on December 6, 1995. After the court summarized the testimony from the guilt phase for the new penalty jury, the Commonwealth sought to prove its case in aggravation by a stipulation and the brief testimony of a police witness, which established the fact of appellant's April 29, 1983 convictions for the December 1982 attempted homicide of G.S., the attempted homicide of S.S., the aggravated assault upon G.S., the aggravated assault upon S.S., and the rape of S.S. The defense then read two stipulations respecting its case in mitigation: (1) that, before April 29, 1983, appellant had no prior criminal convictions; and (2) that, on April 29, 1983, he was 25 years of age. The defense did not present evidence relating to the "catchall" mitigating circumstance set forth in 42 Pa.C.S. § 9711(e)(8). N.T. 12/6/95 at 651–72.

In closing argument, appellant's counsel focused on the Commonwealth's proffered aggravating circumstance, arguing at length that appellant's criminal record did not establish a significant history of prior violent felony convictions because, *inter alia*, his convictions arose from a single set of circumstances occurring one night in December 1982. The jury returned a sentence of death, finding the aggravating circumstance, while finding neither of the proffered mitigating circumstances.

On appeal from this second death sentence, appellant, who was still represented by his two trial attorneys, raised two claims arising under *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), to wit: (1) that the court erred in refusing to charge the jury that a life sentence in Pennsylvania means incarceration for life without the possibility of parole; and (2) that the court erred to the extent that it offered to issue such a charge but only with an elaboration that a pardon or commutation was potentially available to a life-sentenced prisoner. On April 2, 1998, this Court rejected both claims, discharged its statutory review of the sentence, and affirmed. *Commonwealth v. May,* 551 Pa. 286, 710 A.2d 44, 48 (1998).

Appellant then collaterally attacked his conviction and sentence under the PCRA, raising numerous claims of counsel ineffectiveness. An evidentiary hearing was held over the course of two days, during which both of appellant's former attorneys testified.

Counsel testified to a cogent and consistent strategy for conducting the second penalty hearing, a strategy which had its roots in the events that transpired at the first penalty hearing. Counsel stated they were optimistic because they had managed to eliminate the single aggravator found by the first jury, and the remaining aggravator was one which the first jury had declined to accept. Counsel's strategy at resentencing, then, centered upon the best way to defeat this aggravator. In the opinion of appellant's trial lawyers, the best way to achieve the desired sentencing result was to shield the jury from hearing the most damaging trial evidence

against appellant, which consisted of the testimony of appellant's signature crime victims, G.S. and S.S. Both counsel characterized the prior victims' testimony describing appellant's signature attacks on them as "devastating." N.T. 2/15/02 at 10; N.T. 4/9/02 at 20. Indeed, in the view of co-counsel Timothy Sheffey, Esquire, appellant had had no realistic chance of avoiding a first degree murder verdict once the court ruled evidence of the prior signature crimes admissible.

As a result of their observations at the first trial, counsel deliberately sought to make the second sentencing proceeding as "sterile" as possible. Attorney Sheffey explained the re-sentencing strategy as follows:

> We felt that we had a panel of 12 jurors coming in who had not sat through the first trial, had not heard the evidence. And we felt that if we had an opportunity to avoid the death penalty, we had an opportunity to avoid it by having as sterile a proceeding as possible and not having any witnesses who were going to testify about what they were involved with or what they were subjected to. So the decision that we made was to try to develop as unemotional, antiseptic type of proceeding as possible which we came down to having the judge effectively read into the record the entire presentation [i.e., synopsis of trial facts] at the sentencing hearing because we thought we were going to try to take as much emotion out of the proceeding as possible to try to avoid the death penalty.

N.T. 4/9/02 at 17. Sheffey explained that this strategy also led to the determination not to present live witnesses at the second penalty hearing. Thus, in response to a query as to why they had not presented testimony regarding appellant's childhood, Sheffey responded:

> I think there were a couple of reasons. One, we wanted to avoid having any live witnesses so that if we were going to present live witnesses, then the Commonwealth was going to present live witnesses. If we were to present that type of evidence, there were a number of witnesses that depending on what was presented, the Commonwealth would be able to

present witnesses. [S.S.] and [G.S.], or at least one of them, was available to testify.

*Id.* at 18. Sheffey explained that the same consideration played a role in counsel's determination not to present testimonial evidence respecting appellant's character. Appellant's other lawyer, Joseph Farrell, Esquire, corroborated that the strategy adopted for resentencing was "to try and keep it as antiseptic, if you will, as possible." N.T. 2/15/02 at 11. In light of the strategy they had adopted, both lawyers were pleased when they were able to reach an agreement with the prosecutor to have the judge read a mere narrative summary of the trial facts to the new sentencing jury.

In light of the realities of the case, including the trial court's evidentiary rulings, the strategy pursued by counsel at resentencing was constitutionally reasonable. A strategy which hammers at a debatable single aggravating circumstance, while blunting the force of the Commonwealth's most powerful evidence, is surely "a tactical decision about which competent lawyers might disagree." *Bell v. Cone,* 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).[4]

The question of performance on appeal, however, poses different considerations under *Strickland,* since counsel were free to challenge the propriety of the trial court's evidentiary rulings. Attorney Sheffey testified that the appeal was primarily his responsibility. Sheffey related that, as a general matter, his theory of appellate litigation leaned heavily upon the well-known writings concerning appellate practice authored by the Honorable Ruggero J. Aldisert of the U.S. Court of Appeals for the Third Circuit. Counsel noted that Judge Aldisert stressed that an effective appellate advocate should attempt to narrow and focus issues for review, and

4. In *Bell,* the defendant argued, *inter alia,* that his attorney rendered ineffective assistance for failing to deliver a closing argument during the penalty phase of his trial. The Supreme Court found no error in the Tennessee Court of Appeal's rejecting that claim under *Strickland,* noting that the defense attorney's decision to forgo a closing argument in order to deny the prosecution an opportunity to deliver a graphically descriptive rebuttal of defendant's crimes was a tactical decision on which competent lawyers might disagree. *Id.*

"don't 'just raise issue after issue after issue;' instead, '[l]imit the number of issues, pick your best, and go with that.' " N.T. 4/9/02 at 23.[5] Consistently with Judge Aldisert's teachings, counsel was inclined to raise no more than five issues.

Attorney Sheffey then explained that he thought the *Simmons* issues he raised had potential merit. On cross-examination, counsel acknowledged that he raised only two issues on appeal and stated that he did not make a tactical decision not to pursue other issues of potential merit, merely to limit the number of issues; rather, he did not see other issues of possible merit. With respect to the court's ruling that it would sustain a Commonwealth objection to evidence concerning appellant's childhood on grounds of irrelevance to any statutory mitigating circumstance, counsel stated that he viewed this issue as a discretionary one which this Court was unlikely to overturn on appeal. In addition, counsel reiterated his more overarching concern that any testimony the defense presented concerning appellant's "character" could be met with harmful rebuttal evidence. The thrust of this observation, presumably, was that the fear of live rebuttal evidence was enough to make counsel shy away from presenting any penalty phase testimony, irrespective of the technical propriety of the trial court's ruling on admissibility.

Appellant now argues that appellate counsel's decision not to challenge the trial court's ruling on the admissibility of evidence concerning his childhood was unsupported by any reasonable basis. Appellant posits that, under the governing law, he was absolutely entitled to present evidence concerning the abuse he suffered at the hands of his father under the "catchall" mitigator; the trial court did not have "discretion" to exclude such evidence. Moreover, appellant notes that the

5. This Court has cited to Judge Aldisert's teachings on appellate advocacy, including his admonition concerning the negative effects of raising too many appellate issues, and thereby diluting one's better issues. *See, e.g., Commonwealth v. Robinson,* 581 Pa. 154, 864 A.2d 460, 480 n. 28 (2004) (citing Aldisert, *The Appellate Bar: Professional Competence and Professional Responsibility–A View From the Jaundiced Eye of the Appellate Judge,* 11 Cap. U.L.Rev. 445, 458 (1982)); *Commonwealth v. Ellis,* 534 Pa. 176, 626 A.2d 1137, 1140–41 (1993) (same).

concerns which animated counsel's tactical decisions at the penalty hearing—*i.e.*, how to proceed in light of the court's (allegedly erroneous) evidentiary rulings—were not an impediment to challenging the propriety of the evidentiary rulings on appeal. Finally, appellant notes that counsel articulated no basis in fact or tactic for failing to pursue this claim, beyond an erroneous and general assertion that the claim involved a discretionary evidentiary decision unlikely to be overturned on appeal.

In my view, counsel's determination to pursue the *Simmons* issues on direct appeal was reasonably based. Pennsylvania apparently is one of the few jurisdictions which does not issue *Simmons* charges as a matter of course; the U.S. Supreme Court has issued a recent decision which seems to expand the *Simmons* protection, *see Kelly v. South Carolina*, 534 U.S. 246, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002); the High Court recently granted certiorari in a Pennsylvania case to consider the question of requiring *Simmons* charges in all capital cases, albeit it ultimately did not reach the claim because it granted relief on a claim of ineffective assistance of counsel, *see Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 2461 n. 1, 162 L.Ed.2d 360 (2005); and, indeed, this Court sees *Simmons* claims routinely raised, presumably so as to preserve the issue for federal habeas corpus review in the event the U.S. Supreme Court ultimately requires such a charge in all capital cases. However, the evidentiary record in this case also makes clear that counsel had no reasonable basis for failing to challenge the trial court's ruling barring appellant from introducing mitigation evidence concerning the abuse he allegedly suffered at his father's hand as a child. In light of existing and expansive authority from the U.S. Supreme Court, it is clear that appellant was entitled, if he so chose, to forward evidence concerning this childhood abuse under the so-called "catchall" mitigating circumstance, 42 Pa.C.S. § 9711(e)(8), and the trial court clearly erred, as a matter of law, in ruling such evidence irrelevant. Moreover, under counsel's own, informed theory of appellate litigation, raising this additional claim of merit would not have diluted the effect of the other

issues raised; counsel simply failed to appreciate the nature and extent of the trial court's legal error. Counsel's lapse in this regard is not objectively reasonable.[6]

Turning to the question of prejudice, the Majority misperceives the inquiry, as it focuses on trial counsel, not appellate counsel, and indeed goes so far as to conclude that "trial counsel was ineffective" in failing to present mitigation evidence. Majority op. at 213, 898 A.2d at 576. But it was the court's ruling, not counsel's trial performance, which barred the mitigation evidence. Counsel's lapse was on appeal and the proper focus when considering a claim of appellate counsel ineffectiveness obviously must be on the effect of the deficient performance on the outcome of the **appeal.** On this controlling question, I believe that there is a reasonable probability that, if counsel had raised this claim upon the resentencing appeal, this Court would have remanded for a new sentencing proceeding. This is so, in my judgment, because there was but one aggravating circumstance—which was hotly contested—and the erroneously precluded mitigation evidence was not redundant, but instead would have introduced a distinct statutory mitigator for the jury's consideration. To be frank, I am not so sure as some others that this sort of childhood information generates sympathy with a jury. As this Court noted in *Commonwealth v. Moore*, 580 Pa. 279, 860 A.2d 88, 99 (2004), such information "may or may not be perceived as mitigating (one juror may see this as reason for sympathy; another might see it as assuring [the defendant had] his violence permanently ingrained in him). . . ." Nevertheless, on this record, I am satisfied that the probability of prejudice was not ephemeral. The remedy for this deficient performance is to award a new sentencing proceeding.

**6.** It may be that counsel were not inclined to pursue the issue because they were concerned that childhood evidence would open the door to live-witness rebuttal evidence of appellant's other crimes. Counsel, however, did not testify that such was their concern and, in any event, the trial court ruling now at issue was premised upon relevance and admissibility, not the availability of rebuttal.

In summary, I concur in the grant of penalty phase relief upon this claim because a consideration of appellate counsel's actual performance, in light of the contemporaneous circumstances facing counsel and counsel's own testimony, convinces me that the representation on the resentencing appeal, objectively viewed, was constitutionally deficient and prejudicial.

Chief Justice CAPPY and Justice EAKIN join this opinion.

Justice SAYLOR, concur.

I join the majority's reasoning and holding relative to Issues 2, 4, 5, 6, and 8. Although I agree with the result, my reasoning differs from the majority with respect to Issues 1, 3, and 7, as follows.

On the ineffectiveness claim deriving from the trial court's refusal to admit a missing person report containing information favorable to the defense (a subpart of the majority's Issue 1), *see* Majority Opinion, *op.* at 193–94, 898 A.2d at 564, I have reservations concerning the majority's analysis as to whether the report qualifies for treatment under the business records hearsay exception. I believe that this sort of an inquiry in the context of police records should, to a degree, be fact dependent, as the business records exception should not subsume records prepared in anticipation of litigation. *Accord Commonwealth v. Carter,* 861 A.2d 957, 962 (Pa.Super.2004), *appeal granted,* 583 Pa. 678, 877 A.2d 459 (2005)(*per curiam* ). *See generally Echo Acceptance Corp. v. Household Retail Services, Inc.,* 267 F.3d 1068 (10th Cir.2001) ("It is well-established that one who prepares a document in anticipation of litigation is not acting in the regular course of business." (citation omitted)).[1]

On the matter of a second layer of hearsay associated with the missing persons report, I disagree with the majority's assertion that Appellant does not attempt to articulate any basis for admissibility relative to this layer. *See* Majority

1. The report, however, as such appears facially to fall within the scope of the statutory public records exception to the hearsay rule, *see* 42 Pa.C.S. § 6104, and I agree with the majority that a distinct evaluation is warranted with regard to the discrete layers of hearsay.

Opinion, *op.* at 194–95, 898 A.2d at 565. In this regard, Appellant cites *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), arguing that the United States Constitution required the admission of the statements over and against Pennsylvania's hearsay jurisprudence to vindicate Appellant's right to present a defense. *See* Brief for Appellant at 84–85 (citing *Chambers,* 410 U.S. at 302, 93 S.Ct. at 1049) ("[W]here constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.").

I am able to concur in the majority's disposition of this claim for different reasons, however. First, *Chambers* has been closely confined to its facts and circumstances, involving third-party confessions that, if believed, would exculpate an accused. *See, e.g., United States v. Scheffer,* 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998). Further, as Appellant acknowledges, even if it could be extended to the present circumstances, *Chambers* requires that the evidence at issue contain sufficient indicia of trustworthiness to implicate an overarching fairness principle. *See Chambers,* 410 U.S. at 302, 93 S.Ct. at 1049. However, much of the information contained in the missing person report at issue facially lacks such trustworthiness. For example, Appellant contends that the jury should have been presented with a portion of the report summarizing a confidential informant's statement that the victim had been killed by a motorcycle gang as a result of a betrayal associated with drug activity, particularly since the investigating officer asserted in the report that the informant was believable and had provided reliable information in the past. *See* Brief for Appellant at 85. The informant's statement also indicates, however, that the victim was taken to Canada and burned in an incinerator leaving no evidence, *see* Supplementary Report dated January 20, 1984, an assertion that has no basis in fact, since the victim's remains were eventually found in Lebanon County. On its broadest reading, *Chambers* does not override prevailing state hearsay rules in such circumstances. With respect to the report's summary of several witness accounts of having seen the victim alive

after the time that Appellant became incarcerated, again, Appellant does not identify particularized circumstances strongly evidencing trustworthiness associated such statements (he points out only that the alleged sightings were by persons who knew the victim and had no apparent reason to lie). Rather, the report seems to me to represent an amalgamation of frequently inconsistent information from numerous sources collected by police over the course of several years, containing a collage of fact, rumor, and unreliable information which are, in many instances, indistinguishable on the face of the report, as frequently occurs in missing person investigations.[2]

Appellant also contends that his trial counsel were ineffective for failing to present testimony from the witnesses named in the report.[3] Although the claim that trial counsel's stewardship was deficient in their failure to investigate and produce at trial the witnesses identified in the report seems colorable and might otherwise warrant an evidentiary hearing, there are no affidavits or declarations from such witnesses within Appellant's evidentiary proffer submitted with the PCRA petition. As such, Appellant has not brought material facts into issue with regard to prejudice, and therefore, I believe that the PCRA court's decision to dismiss the claim

2. What does seem to be amply supported in the document is that the victim was involved in illegal drug activity and associated with others in such endeavor; this information was first conveyed to police by the victim's parents at the outset of the investigation and runs throughout the witness accounts over the three-year period covered by the report. Absent some more specific, admissible evidence that the victim was killed as a consequence of this activity, however, I believe that the admission of the evidence of drug activity resided within the discretion of the trial court.

3. The majority incorrectly indicates that Appellant does not offer this contention. *Compare* Majority Opinion, at 196–97, 898 A.2d at 566 (indicating that Appellant "does not now contend that trial counsel were ineffective for failing to call those witnesses to testify"), *with* Brief for Appellant at 87 ("Alternatively, defense counsel should have conducted an independent investigation of the information in the missing persons report and should have been prepared to present the witnesses named in that report ... [;] [c]ounsel's failures violated Appellant's state and federal constitutional rights to effective assistance of counsel.").

without an evidentiary hearing is supportable. *Accord Commonwealth v. Priovolos,* 552 Pa. 364, 368–69, 715 A.2d 420, 422 (1998) (describing the required offer of proof relative to a claim of deficient attorney stewardship for failing to call a witness at trial).

Regarding Appellant's ineffectiveness claim related to appellate counsel's failure to challenge the trial court's decision to exclude defense evidence rebutting the Commonwealth's assertion that the victim's character was such that she would not leave her child for extended periods (treated in the latter portion of Issue 1 of the majority opinion), *see* Majority Opinion, *op.* at 196–97, 898 A.2d at 566, I note in the first instance that the PCRA court's summary disposition is facially erroneous. Initially, the PCRA court correctly indicated that the underlying claim of trial court error was waived, because it was not raised on direct appeal. *See Commonwealth v. May,* No.1990–10071 ¶ 8 (Order dated April 12, 2001). The only mention in the court's order of the derivative ineffectiveness claim, however, is in a passage addressing a generic claim of ineffective assistance of counsel contained in the PCRA petition, which the court deemed redundant, "as properly layered claims of ineffective assistance of all prior counsel were included in each of the substantive claims set forth in the PCRA petition." *See id.* ¶ 14. The deficiency in this analysis is that there is no resolution of the properly layered ineffectiveness claim that was included with the substantive claim. Rather, such claim appears to have been entirely overlooked by the court.

I believe that the error in this analysis would be sufficient reason to remand the issue to the PCRA court to correct its mistake and address the ineffectiveness claim in a reasoned fashion. Further, I note that the Commonwealth offers no substantive rebuttal concerning the allegation of an underlying trial error; it merely contends that it is not cognizable under the PCRA, as the PCRA petition does not make an affirmative statement as to Appellant's actual innocence, *see* Brief for Appellee at 34, and that counsel cannot be deemed ineffective for failing to raise this claim on appeal, because they pursued

a reasonable strategy of limiting the direct appeal to a few issues to maintain credibility with the Court. *See id.* at 35. The Commonwealth's first assertion, however, is factually inaccurate, *see* PCRA Petition ¶ 8 ("By this petition for habeas corpus and post-conviction relief, Petitioner asserts that he is innocent ...."), and, in my view, assessment of its second contention requires, at a minimum, some evaluation of the relative merits of the claims raised in relation to the claim that Appellant now contends should also have been raised. *See, e.g., Commonwealth v. Williams,* 557 Pa. 207, 248, 732 A.2d 1167, 1189 (1999); *Commonwealth v. Brown,* 544 Pa. 406, 425, 676 A.2d 1178, 1187 (1996) (allowing for the possibility of post-conviction relief "if it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued" (citation omitted)).[4]

The majority proceeds to resolve the claim by attributing an improper motive to the defense, asserting that trial counsel sought only to disparage the victim. *See* Majority Opinion, *op.* at 196–97, 898 A.2d at 566. In the absence of a hearing and a credibility assessment by a fact finder, I am unable to join this determination. The information that trial counsel sought to adduce was directly responsive to a contention made by the Commonwealth in its case-in-chief regarding the victim's behavior for the relevant purpose of establishing a general time frame in which the killing occurred;[5] as such, it is not obvious to me that an improper motive on counsel's part was present.

4. It is obviously necessary in undertaking such assessment to guard against the distorting effects of hindsight. *See Commonwealth v. Howard,* 553 Pa. 266, 274, 719 A.2d 233, 237 (1998). At the same time, however, where it can be demonstrated that an alternative not chosen offered a potential for success substantially greater than the course actually pursued, a finding that a given strategy lacked a reasonable basis may be warranted. *See id.*

The Commonwealth asserts that counsel's strategy on the first direct appeal was clearly reasonable, because they were successful in obtaining a new sentencing hearing. While this is certainly a pertinent consideration, I do not believe that it should obviate an evaluative assessment of other issues, particularly where Appellant also sought relief from the conviction itself.

5. To aid in establishing the time frame of the victim's death, *see* N.T., March 6, 1991, at 499, the Commonwealth introduced testimony from her sister indicating that the victim had a very close relationship with

Although for the above reasons I believe that the claim is highly problematic, ultimately, I concur in the denial of PCRA relief, solely because prejudice is not apparent from the face of the record, and there is no relevant post-conviction evidentiary proffer which would have required a hearing relative to the prejudice assessment. During the cross-examination of the victim's sister, the jury learned that the victim used alcohol and illegal drugs, that she associated with others fairly freely and openly in such activities, and that she spent time on weekends in these endeavors, apparently away from her child. *See* N.T., March 7, 1991, at 671–88. While the limitations on the defense presentation curtailed Appellant's ability to demonstrate any additional irresponsibility to rebut the Commonwealth's evidence, based on the record presented, I do not believe that such restriction is sufficient to create a cloud on the verdict, at least in the absence of some additional, extra-record showing.

As to the question designated in Issue 3 in the majority opinion concerning the bolstering of Commonwealth witnesses, *see* Majority Opinion, *op.* at 200–01, 898 A.2d at 568, in the first instance, I believe that the detective's commentary concerning the eminence of Dr. Hoffman's qualifications was unnecessary to his explanation of the course of events and would disapprove of such editorializing, although I believe that the prejudice is modest. With regard to Dr. Hoffman's testimony referencing the report of the non-testifying defense expert, Dr. Mihalakis, I tend to agree with Appellant that there was a modest degree of improper bolstering in the identified passage from the transcript, *see* N.T., March 6, 1991, at 650 (reflecting the district attorney's question to the Commonwealth expert, "Again going to Dr. Mijalakis's report, you indicated that he was in agreement with you in most points ...."), as distinguished from the latitude afforded to experts to explain the basis for their opinions in terms of

her son, *see id.* at 665, and that it was unusual for the victim to leave her son for a long period of time, *see id.* at 669.

material not in evidence, including other expert opinion, where such material is of a kind that is relied upon by experts in the field. *See, e.g., Boucher v. Pennsylvania Hosp.,* 831 A.2d 623, 628 (Pa.Super.2003). I would therefore also address this aspect of the claim in terms of the absence of sufficient prejudice appearing on the face of the record, and the absence of an extra-record proffer which might implicate a right to an evidentiary hearing.[6]

Finally, concerning the discussion and resolution of the mitigation-related claims (Issue 7), *see* Majority Opinion, at 207–13, 898 A.2d at 572–76, my thoughts largely align with the majority's analysis, but I agree with Mr. Justice Castille's point that, upon a sufficient penalty-phase investigation uncovering all reasonably available mitigating evidence, informed strategic choices by counsel may shape the information that is ultimately presented to the jury. *See* Concurring Opinion, at 218–19, 898 A.2d at 579–80. Here, however, as the majority amply develops, at the appellate review stage, the claim that the trial court had improperly blocked Appellant from developing relevant mitigating evidence in the penalty phase of his trial was strong, obvious from the record, and meritorious. *See* Majority Opinion, at 207–13, 898 A.2d at 572–76. At least in the absence of some extraordinary circumstance more compelling than the adherence of counsel to some fixed notion concerning the number of claims that should be raised on appeal, I agree with the majority that an appellate advocate's failure to raise a strong, obvious, and meritorious claim should be sufficient to satisfy a post-conviction petitioner's burden to prove by a preponderance of the evidence that the verdict has been rendered unreliable by deficient performance.

6. In terms of the district attorney's presentation, it should also be noted that, at the time of Dr. Hoffman's testimony, the defense was continuing to reserve the possibility of calling Dr. Mihalakis as a witness.