IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David Carletti and Brenda Carletti,   :
h/w   :
   :
      v.   :  No. 1312 C.D. 2017
   :  Argued:  June 7, 2018
Commonwealth of Pennsylvania,   :
Department of Transportation,   :
           Appellant   :


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE DAN PELLEGRINI, Senior Judge


OPINION BY
SENIOR JUDGE PELLEGRINI         FILED:  July 17, 2018


The Commonwealth of Pennsylvania, Department of Transportation (PennDOT) appeals from the post-trial order of the Court of Common Pleas of Delaware County (trial court) denying PennDOT's Motion for Post-Trial Relief seeking Judgment *Non Obstante Veredicto* (JNOV) or, alternatively, a new trial. In support of its contention that the trial court should have granted its motion for JNOV, PennDOT argues that the plaintiffs, David and Brenda Carletti (together, the Carlettis), failed to offer any competent, non-hearsay evidence (1) on the essential elements of their negligence claim, and (2) that PennDOT had actual or constructive notice of an alleged defect in a state-operated roadway, which would thereby cause PennDOT to fall under the highway exception to sovereign immunity.  In support of its argument for a new trial, PennDOT contends that the

trial court failed to give adequate cautionary jury instructions. For the following reasons, we reverse and remand.

## I.

### A.

At approximately 6:30 p.m. on May 26, 2012, David Carletti (Mr. Carletti) was riding his bicycle downhill at about 30 miles per hour on State Route 320/Sproul Road near the entry of a bridge over trolley tracks in Springfield Township, Pennsylvania, when he allegedly hit a "hump" in the road. Mr. Carletti crashed, hitting his head on the pavement. Mr. Carletti was 63 years old at the time of the accident and had been an avid and experienced cyclist for 15-20 years, averaging 50-60 miles per week on his bicycle. He was wearing a helmet but the force of the fall caused it to crack. David and Pamela Kauffman (together, the Kauffmans) were standing nearby and tended to Mr. Carletti after his fall. While Pamela Kauffman (Mrs. Kauffman) was looking away at the exact moment of the accident, David Kauffman (Mr. Kauffman) witnessed it as it was happening.

Sergeant Andrew McKinney (Sergeant McKinney) of the Springfield Township Police Department came to the scene and spoke to the Kauffmans about the accident, including their perceptions as to what caused Mr. Carletti to crash. Sergeant McKinney authored an incident report, in which he stated:

> The witnesses advised that they observed the victim traveling eastbound, on his bicycle, in the center of the traffic lane when he hit a hump in the roadway. As a result, the victim went forward over the handle bars landing on his head. The victim's bike helmet was located several feet away and was damaged.

2

(Reproduced Record (R.R.) at 520a.) Though he did not take measurements, Sergeant McKinney estimated that the hump Mr. Carletti hit was about three feet wide and rose a few inches above the rest of the roadway. Though described as a hump, it is more accurately described as a linear patch to a cut-out portion of the roadway, stretching from one side of the road to the other.

Immediately after the fall, Mr. Carletti suffered skull and facial fractures, as well as four broken ribs and a fractured T-2 vertebrae of his thoracic spine. Mr. Carletti also suffered serious, irreparable brain damage.

**B.**

The Carlettis brought an action against PennDOT alleging negligence in the design and maintenance of the portion of the roadway where the accident occurred, as well as a failure to warn bicyclists of the hazardous condition and failure to remedy the condition after receiving notice thereof.[1] Mrs. Carletti claimed loss of consortium.

During discovery, the Carlettis retained Shawn Gyorke (Gyorke), an accident reconstructionist and Arlington Heights, Illinois Police Commander, as an expert witness. In Gyorke's report, he opined that:

---

[1] The Carlettis also included in their Second Amended Complaint actions against six other defendants besides PennDOT, including Springfield Township and five private parties that were alleged to have been responsible for the "selling, manufacturing, marketing, and design" of Mr. Carletti's helmet and bicycle. (R.R. at 24a-25a.) The claims against all defendants except PennDOT were resolved before trial and, therefore, are not part of this appeal.

The only stimulus for the ejection, which can reasonably account for the subsequent accident, was the roadway defect (patched section of asphalt), as it provided a discontinuity in the lateral, vertical and longitudinal directions. By way of explanation, absent an alternative cause, we can reasonably conclude the nearby road defect did cause the ejection/fall.

The roadway defect was a dangerous condition. Furthermore, it posed a hazard due to improper maintenance. By way of explanation, [PennDOT], as the agent responsible for maintaining the aforementioned roadway, had a duty to make the highway safe for its intended purpose. Seeing as though there were no dedicated off-highway bicycle paths available in the same area, the intended purpose of the highway would include, but not be limited to, transportation by way of bicycle.

Knowing the ejection was a product of the listed defect, PennDOT failed in their [sic] duty to make the highway safe for its intended purpose. Similarly, the failure in maintaining the highway caused harm to Mr. Carletti. Simply put, the roadway defect was a product of improper maintenance, thereby creating a dangerous condition which was unreasonably unsafe for passing cyclists.

(R.R. at 76a.)

## C.

At trial, portions of PennDOT Assistant Manager Joseph Zielke's (Zielke) deposition were read into the record. He confirmed that Route 320/Sproul Road is a state road and, as such, it is PennDOT's responsibility to maintain it and ensure it is free of defects. He also stated that in his role as Assistant Manager, he conducts inspections on state-operated highways to search for possibly dangerous

4

conditions. Regarding the dangerous condition that the Carlettis claim caused the accident, the following exchange took place during Zielke's testimony:

> Q: If that bump, when you do your inspections of the roadway, if you saw a bump such as you see in this photograph, is that something that you would have put in to have repaired?
>
> A: Yes, sir.
>
> Q: And why?
>
> A: I would have probably milled it.
>
> Q: And what does that mean, sir?
>
> A: And I see the grass in there, too, so, yes, I would have.
>
> ***
>
> Q: For us lay people, milling means what?
>
> A: Going to make it level to the roadway.
>
> Q: And why would you do that?
>
> A: Get the bump out of the road.

(R.R. at 516a.)

Mr. Carletti did not testify as to what caused the accident because he did not recall the specifics of the incident due to the serious brain trauma he suffered as a result of it. Mr. Kauffman, the sole witness of the accident, also did not testify. In fact, Sergeant McKinney and Gyorke were the only liability witnesses offered at trial.

5

Sergeant McKinney testified that when he arrived at the accident scene, the Kauffmans were tending to an unconscious Mr. Carletti. Sergeant McKinney also testified that, at the scene, he wrote down information that the Kauffmans relayed to him and, within a few hours of the incident, filled out an incident report of what he observed. When questioned about the cause of the accident, Sergeant McKinney read directly from the portion of his report containing Mr. Kauffman's observations and, later in his testimony, confirmed that was what Mr. Kauffman told him. He also testified that the Kauffmans were standing a couple hundred feet away from where Mr. Carletti hit the hump.

Sergeant McKinney did not investigate the scene or take any measurements because it was not in his practice to do so unless the accident involved either a death or something of a criminal nature. He described the hump to the Carlettis' counsel as being roughly three feet wide and "a couple of inches" high. (R.R. at 408a.) Upon cross-examination, he described the hump to PennDOT's counsel as "at some point in time [being] several inches high." (R.R. at 409a.)

The Carlettis called Gyorke as an accident reconstruction expert to establish the cause of the accident. In arriving at his opinion as to what caused Mr. Carletti's crash, he testified that he reviewed a number of depositions, including those of Sergeant McKinney and Mr. Kauffman, which were not included in the record. Gyorke also reviewed Mr. Carletti's medical records, which included CT scans, and Sergeant McKinney's incident report. He had not visited the scene itself because by the time he had been retained, the defect had already been

6

repaved. However, Gyorke was able to review photographs of the hump in the road dating back to June 2011, as well as photographs taken in August 2012 just months after Mr. Carletti's accident.

Regarding the defect on the roadway, Gyorke testified that the asphalt had worn away after rising and being pounded down in certain areas, "[s]o there is now a gap down and a hump up where the asphalt has not been chipped away." (R.R. at 276a.)[2] Gyorke went on to describe the defect as follows:

> There is essentially a pavement section that has been now replaced which provides both a vertical change as well as a longitudinal change and lateral change in elevation with regards to the roadway. The roadway is no longer flat when he hits that. It's basically a – I'll call it a hump or a defect in the road.

***

---

[2] PennDOT's counsel objected to this testimony because Gyorke was not a highway engineer and was not qualified to speak about the way asphalt moved. The trial court asked Gyorke if it was in the field of his expertise to know how highways may become "uneven, humped, and leveled and lowered." (R.R. at 277a.) He responded in the affirmative, stating that in a course he teaches in accident reconstruction at Northwestern University's Center for Public Safety:

> We deal with this all the time, sir. We spend the better part of our – our first at-scene investigation course is two weeks long. We spend the better part of four or five days teaching officers and engineers about roadway aspects and evidence from roadways, of which we deal with things like asphalt, different paved surfaces, the consistency, what their coefficient of frictions are for various surfaces. I mean we spend a very long time teaching these types of topics too. These are just entry level reconstructionists.

*Id.* The trial court then overruled the objection.

7

[I]t's a patch job essentially, for lack of a better term, wherein now there has been, due to weather and other things, that has risen above the level of the roadway. There is both a longitudinal change as well as a wave effect of the pavement. Essentially when cars travel – continue traveling over those sections of roadway, they pat down a certain section of the asphalt while the other sections are allowed to rise, for lack of a better term, which means that you have this wave effect across the defect as well as a hump in the roadway as well. That's the impact point that he strikes before being launched off his bicycle.

\*\*\*

So where the asphalt has now worn away, there is now a gap. Okay? The asphalt is meant to patch the gap. But not only has the asphalt risen and been pounded down in certain areas, making it kind of that wave effect, but several parts were, due to wear, of that which is not intended to be a long-term solution or a long-term fix for a roadway of this particular condition, it's worn away, leaving a gap before you actually hip [sic] the hump as well. So there is a gap down and then a hump up where the asphalt has not been chipped away.

(R.R. at 273a – 275a.)

Regarding whether the hump in the road was, in fact, a defect, Gyorke noted that he reviewed Zielke's deposition testimony, which assisted him in coming to his conclusion that the hump in the roadway was a dangerous or defective condition of the roadway and that it undoubtedly was the cause of the accident. When counsel for the Carlettis questioned him regarding why he was certain the defect in the roadway caused the accident rather than Mr. Carletti braking, Gyorke responded:

8

So there's a difference when it comes to the mechanics of crash with regards to the way the person's body moves when they [sic] yank, like you just described, yank on the brakes. That's what called an end-over or people will commonly refer to it as an endo. I don't know why but they use that particular acronym. But an endo is distinctly different in that it causes your body to do something completely dissimilar to what the witnesses in this particular case describe. When you impact something, that's a slowing of the bicycle and your body keeps going. Okay? When you can – when you perform or when you grab the brakes really hard, and you'll see this on occasion during bicycle races and things like that where riders panic and stop. When you brake hard, you can also cause to put the bike to – if I hold it hard enough, I can cause the bike to go over. The problem is is [sic] that my body doesn't get ejected upon the roadway. My body stays with the bicycle now because I'm applying the brakes and I go over and I hit head first upside-down, about as close to a 90-degree turnover essentially, and that is not what we saw in this particular case. So we know that it's not some event where [Mr. Carletti] simply jams on the brakes and basically does a 90-degree turn and hits his head first on the ground.

***

So if I'm a rider and I am on the bicycle and now my head is rotated down along with the bicycle, I'm basically taking it from here and I'm rotating the bicycle over. We would see an impact on the top of the helmet and we would see an impact on the top of the head. If it was – if it were a product of jamming on the brakes so to speak and going over.

(R.R. at 285a – 286a.)

Gyorke also explained the exact scenario of the accident as he reconstructed it to a reasonable degree of certainty:

9

So as the bicyclist is riding, he hits this defect and the bicycle is slowed. The bicycle is definitely being slowed as a result of impacting the barrier. It's his body that's not [because] his body isn't conjoined to the bicycle. So his body follows Newton's first law of motion . . . in that his body continues forward at the speed at which he was riding and goes over the handlebars, like Mr. Kauffman describes, whereas the bicycle, having been slowed due to the impact, is slightly behind him, meaning that the bicycle has been slowed some but his body has not and that's why his body goes over the handlebars and he goes tumbling down the roadway to where his final rest position is.

(R.R. at 327a.) On cross-examination, PennDOT's counsel asked Gyorke how he could have relied upon Mr. Kauffman's deposition testimony in forming his opinion when Mr. Kauffman himself did not know precisely what caused Mr. Carletti to crash. Gyorke replied:

It's by way of – it's by way of crash reconstruction that knowing the defect is there, knowing the size, scope, and nature of the defect, looking at the physical evidence, and then taking all of those facts into consideration is how you arrive at the ultimate opinion that it was the defect that did, in fact, cause the crash. Mr. Kauffman is just being honest because he doesn't – he's not a crash reconstructionist. He didn't attempt to reconstruct this crash. All he knows is that he sees [Mr. Carletti] get ejected over his bicycle, where the defect is in the roadway.

(R.R. at 312a - 313a.) Gyorke did, however, concede that Mr. Kauffman did not state whether he knew if Mr. Carletti grabbed his brakes. Counsel for PennDOT then read part of Mr. Kauffman's deposition testimony, which states:

10

> I never said starts to lose control. What I said is that something happened [sic] the bike back wheel came up and he went over the handlebars.

(R.R. at 321a.) Later, PennDOT's counsel questioned Gyorke on this point:

> Q: So when you were asked about what Mr. Kauffman said, equally, you would disagree that he said in his deposition nine times that I can't tell you what caused him to flip over, correct?
>
> ***
>
> A: He does not know why the bike flipped over. He only knows that [Mr. Carletti] was ejected when he reached the defect.
>
> Q: Okay. [Mr. Carletti] doesn't say he reached the defect and the defect caused him to flip. [Mr. Carletti] says I don't know. It was the area of where it was, correct?
>
> A: Correct.

(R.R. at 365a – 366a.)

## D.

Throughout the trial, the Carlettis' counsel stated that he was going to call Mr. Kauffman as a witness. Based upon this assumption, throughout Gyorke's testimony, multiple references were made to Mr. Kauffman's deposition testimony. At the close of their case, the Carlettis' counsel stated that he did not intend to call Mr. Kauffman as a witness. Moreover, Mr. Kauffman's deposition was not entered into the record.

11

Counsel for PennDOT moved to strike as hearsay all references to Mr. Kauffman's out-of-court statements, including all references to these statements in Gyorke's testimony, arguing that the only reason the trial court permitted the references was because Mr. Kauffman was expected to testify. The trial court agreed, stating "I think I got to exclude the Kauffman's [sic] testimony or there is reference to them and [Gyorke's] opinion is still there been [sic] based on all the things he reviewed." (R.R. at 441a.) The trial court made a similar ruling with regard to Sergeant McKinney's reiteration of what the Kauffmans said to him. (R.R. at 442a - 444a.)

Acknowledging that it "agreed that the Kauffman's [sic] [deposition] testimony is hearsay since they are not being called," the trial court found that "records and reports" upon which an expert relies – even if hearsay – are admissible to help the jury assess an expert's opinion, "but not as establishing the truth of the underlying information." (R.R. at 456a.) The trial court also reasoned, "it will be up to the jury to recall what the basis of Mr. Gyorke's opinion was and there will be no mention of the Kauffman's [sic] testimony by either side [in their closings.]" *Id.*

Separately, PennDOT moved for a nonsuit on the merits of the Carlettis' claims, arguing that the Carlettis had not proven that PennDOT had the requisite actual or constructive notice of a dangerous condition on Route 320. It also contended that it was entitled to a nonsuit because there is no proof of a causal connection between the alleged defect on Route 320 and Mr. Carletti's accident

because the Carlettis' case rested entirely upon Gyorke's impermissible speculation and conjecture. The trial court denied this motion.

The jury returned a verdict in favor of Mr. Carletti and awarded damages in the amount of $4,458,530.50 for loss of wages, medical costs and pain and suffering, and $1,000,000 in favor of Mrs. Carletti for loss of consortium. PennDOT made an oral motion for post-trial relief, but the motion was immediately denied. PennDOT followed with a written motion for post-trial relief, which was also denied. The trial court also molded the verdict, in accordance with 42 Pa.C.S. § 8528(b),[3] to $250,000 per plaintiff, for a total of $500,000, plus delay damages of $18,811.00. This appeal followed.[4]

---

[3] 42 Pa.C.S. § 8528(b) provides that in actions for damages against a Commonwealth party:

> Damages arising from the same cause of action or transaction or occurrence or series of causes of action or transactions or occurrences shall not exceed $250,000 in favor of any plaintiff or $1,000,000 in the aggregate.

[4] We may only reverse upon a showing that the trial court clearly abused its discretion or committed an error of law. *Worley v. County of Delaware*, 178 A.3d 213, 228 (Pa. Cmwlth. 2017). In reviewing a motion for JNOV, "the evidence must be considered in the light most favorable to the verdict winner, who must be given the benefit of every reasonable inference of fact arising therefore, and any conflict in the evidence must be resolved in his or her favor." *Id.* JNOV should only be entered in a clear case and all doubts should be resolved in favor of the verdict winner. *Id.* JNOV is properly granted only where the movant is entitled to judgment as a matter of law or evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. *Id.* A movant is entitled to judgment as a matter of law when the court reviews the record and concludes that even with all factual inferences decided adverse to the movant, the law requires a verdict in its favor. *Moure v. Raeuchle,* 604 A.2d 1003, 1007 (Pa. 1992). Alternatively, JNOV may be granted on an evidentiary basis when the trial court reviews the record and concludes that the evidence was such that a verdict for the movant was beyond peradventure. *Id.*

13

## II.

PennDOT contends that it was entitled to JNOV because: (1) the Carlettis failed to establish negligence because they failed to provide competent testimony on the element of causation;[5] and (2) the Carlettis' claim does not fall within an exception to sovereign immunity because there was no evidence that PennDOT had notice of the defect.

## A.

A commonwealth agency waives its sovereign immunity for dangerous conditions of the highway under its jurisdiction. 42 Pa.C.S. § 8522(b)(4). Although it is not an insurer against all defects, a commonwealth agency is required to maintain its highways in a reasonably safe condition for the traveling public. The duty to keep the highway safe for the traveling public includes the duty to design the highway in a reasonably safe manner, maintain the highway in a reasonably safe manner, and update the design, if improvements are necessary, to protect the public from harm. *Mitchell v. Borough of Rochester*, 150 A.2d 338 (Pa. 1959).

A commonwealth agency also waives immunity for a claim that gives rise to damages due to:

> A dangerous condition of Commonwealth agency real estate and sidewalks, including Commonwealth-owned

---

[5] It is well settled that a person claiming negligence must establish the elements of: (1) duty, (2) breach, (3) causation, and (4) damages. *Bubba v. Department of Transportation*, 61 A.3d 313, 316 (Pa. Cmwlth. 2013).

real property, leaseholds in the possession of a Commonwealth agency and Commonwealth-owned real property leased by a Commonwealth agency to private persons, and highways under the jurisdiction of a Commonwealth agency. . . .

42 Pa.C.S. § 8522(b)(4). This exception does not specifically provide for actual or constructive notice of the dangerous condition of the highway.[6] However, because

---

[6] The other exception to immunity regarding highways is for dangerous conditions created by natural elements:

> A dangerous condition of highways under the jurisdiction of a Commonwealth agency created by potholes or sinkholes or other similar conditions created by natural elements, except that the claimant to recover must establish that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred and that the Commonwealth agency had actual written notice of the dangerous condition of the highway a sufficient time prior to the event to have taken measures to protect against the dangerous condition.

42 Pa.C.S. § 8522(b)(5).

This exception encompasses holes in highways resulting from deterioration caused by a combination of water, freezing, thawing and traffic. *Cressman v. Department of Transportation*, 538 A.2d 992 (Pa. Cmwlth. 1988). Where the defect in the roadway is solely the result of traffic conditions, it appears that the subsection (b)(4) highway exception applies, not the (b)(5) exception. In *Bartell v. Straub*, a drop off (a lineal pothole) between the roadway and the berm that had been created by vehicles' wheels or tires eroding the berm was not considered a natural condition that fell within the exception. 578 A.2d 72 (Pa. Cmwlth. 1990), *rev'd on other grounds*, 613 A.2d 1185 (Pa. 1992). For defects which fall under (b)(5), actual written notice is also required. That the commonwealth agency knew or should have known about the pothole or other natural condition is insufficient to satisfy the notice requirement. *Stevens v. Department of Transportation*, 492 A.2d 490 (Pa. Cmwlth. 1985). This requirement has been held not to violate the Pennsylvania Constitution and it serves the legitimate purpose to give the commonwealth agency sufficient notice to cure the defect. *Ketterer v. Department of Transportation*, 574 A.2d 735 (Pa. Cmwlth. 1990).

**(Footnote continued on next page…)**

15

it is a prerequisite that an action must be maintainable at common law, and at common law the action required such notice, the commonwealth agency must have actual or constructive notice of the dangerous condition to maintain an action under the exception to sovereign immunity.

For the governmental entity to be charged with constructive notice of a dangerous condition of a roadway, the condition had to be apparent upon reasonable inspection. *See Good v. City of Philadelphia*, 6 A.2d 101 (Pa. 1939); *Department of Transportation v. Patton*, 686 A.2d 1302 (Pa. 1997). Whether there has been constructive notice is typically a jury question, but the issue may be decided by the court "when reasonable minds could not differ as to the conclusion." *Patton*, 686 A.2d at 1305.

PennDOT contends that the question of constructive notice should not have been submitted to the jury because "reasonable minds" could not differ as to whether there was sufficient evidence that it had constructive notice of the dangerous condition. While there is no evidence regarding precisely how long the dangerous condition existed, images of the hump dating back to over a year before the accident occurred were included in the record, as well as comparative images from a few months after the accident. There is no doubt the defect was apparent on reasonable inspection because Zielke testified that if he observed the condition

_____

**(continued…)**

The parties agree that the Carlettis' claim falls within the "dangerous condition of the highway" exception set forth in 42 Pa.C.S. § 8522(b)(4).

16

while inspecting the road, he would have taken corrective action by milling the road to take out the hump and other imperfections.

Because there was sufficient competent evidence that the jury could have found that PennDOT had constructive notice of the dangerous condition, the trial court did not err in denying PennDOT's motion for JNOV based upon the issue of sovereign immunity.

## B.

Even if it is deemed to have constructive notice, PennDOT contends that the Carlettis failed to show the causal link between PennDOT's alleged negligence and the injuries Mr. Carletti suffered. *See Martinowski v. Department of Transportation*, 916 A.2d 717, 725 (Pa. Cmwlth. 2007) (holding that a plaintiff's lack of memory regarding how or why her vehicle ran off the road resulted in a "gap in the chain of causation"). It argues that the only evidence relating to the cause of the accident was the testimony of Gyorke and Sergeant McKinney, and that both witnesses relied upon either facts not of record or impermissible hearsay as the basis for their testimony. Specifically, regarding Gyorke's testimony, PennDOT contends that his opinion as to what caused the accident and the mechanics of the accident are based upon Mr. Kauffman's deposition testimony, which was not introduced into the record.

The rules of evidence permit a qualified expert to "testify in the form of opinion." Pa.R.E. 702. Specifically:

17

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Pa.R.E. 703. An expert opinion may be based on inadmissible facts or facts not in evidence, including other expert opinions and hearsay statements, as long as such facts are of a type reasonably relied on by experts in that profession used to form an opinion. *Commonwealth v. Towles*, 106 A.3d 591, 605 (Pa. 2014). For example, Gyorke legitimately relied upon a user manual issued by the United States Department of Transportation to estimate the speed of the bicycle at the time of the accident.

An expert may also express an opinion as to the specific cause of an incident based on facts that the expert assumes, but does not know, "if he answers hypothetical questions based upon assumptions which the jury would be warranted in finding as facts from the evidence presented." *DiBuono v. A. Barletta & Sons, Inc.*, 560 A.2d 893, 895 (Pa. Cmwlth. 1989). The facts which the expert assumes to be true for the purposes of a hypothetical must be put in evidence by witnesses other than the expert himself. *Houston v. Canon Bowl, Inc.*, 278 A.2d 908 (Pa. 1971). "To the extent that [the expert's] opinions were predicated upon factual assumptions . . . those assumptions 'must find some support in the record.'" *Shaw by Strain v. Stackhouse*, 920 F.2d 1135, 1142 (3d Cir. 1990) (quoting *Pennsylvania Dental Association v. Medical Service Association of Pennsylvania*, 745 F.2d 248, 262 (3d Cir. 1984)). This is because the opinion of an expert does not constitute proof of the existence of facts necessary to support the opinion. *Collins v. Hand*,

18

246 A.2d 398, 404 (Pa. 1968); *see also Kimberly Clark Corporation v. Workers' Compensation Appeal Board (Bullard)*, 790 A.2d 1072 (Pa. Cmwlth. 2001) (holding that a surveillance video not offered into evidence could not support a medical expert's opinion that an individual could return to work without restrictions because it lacked factual foundation).

In this case, Gyorke's opinion that Mr. Carletti crashed due to a defect in the road is predicated upon his opinion that Mr. Carletti hit the hump in the road and was ejected from his bicycle rather than having hit his brakes to cause an "end-over." An end-over, according to Gyorke's testimony, is caused when an individual on a bicycle brakes too suddenly and causes the bike to "go over." However, in such an instance, "[the] body doesn't get ejected upon the roadway. [The] body stays with the bicycle. . . ." (R.R. at 286a.) Gyorke's opinion was based on Mr. Kauffman's deposition. Because that deposition was not offered into evidence, it could not be used as a basis for Gyorke's opinion.

However, there *is* evidence as to what caused the accident and upon which Gyorke could base his opinion. Sergeant McKinney testified regarding what Mr. Kauffman told him when he arrived at the accident scene. He stated in his report that Mr. Kauffman saw Mr. Carletti hit a hump and "[a]s a result, [Mr. Carletti] went forward over the handle bars landing on his head." (R.R. at 520a.) PennDOT does not contend that this evidence, offered into the record, was a basis for Gyorke's opinion that the hump caused the accident. PennDOT instead argues that Sergeant McKinney's report and testimony regarding what Mr. Kauffman told

19

him should not have been admitted or allowed because it is inadmissible hearsay.[7] However, the Carlettis point out that PennDOT never made an objection to Sergeant McKinney's testimony regarding what Mr. Kauffman said to him. We agree with the trial court that the issue of whether these statements constituted inadmissible hearsay was waived.[8]

---

[7] Pennsylvania Rule of Evidence 802 provides that hearsay is not admissible unless some exception applies. Generally, "[a] police report prepared by an officer who is not a witness to the accident is inadmissible hearsay that should not be admitted into evidence. Nor should a party be able to get such a report into evidence in an indirect manner." *Rox Coal Company v. Workers' Compensation Appeal Board (Snizaski)*, 807 A.2d 906, 914 (Pa. 2002) (citing *Holland v. Zelnick*, 478 A.2d 885, 888 (Pa. Super. 1984)). A police report containing statements from persons who witnessed an incident is double hearsay and, therefore, is only admissible if there is a separate hearsay exception for each statement in the chain. *Commonwealth v. May*, 898 A.2d 559, 566 (Pa. 2006); s*ee also Walker v. Spiller,* (E.D. Pa., No. 97-6720, filed June 9, 1998) (holding that a police report which contains a cursory summary of a victim's report that he had been robbed at gunpoint constituted double hearsay and the statements did not fall within any exception).

[8] Even though it found that the issue was waived, the trial court found that the statement was permitted under the "recorded recollection" exception to hearsay. Pennsylvania Rule of Evidence 803.1(3), among other things, provides that it only applies to refresh the memory of those who made the statement. Pa.R.E. 803.1(3). Mr. Kauffman's statements memorialized by Sergeant McKinney's incident report do not fall under this exception because he was obviously not the "declarant" of Sergeant McKinney's report and was not a witness in this case.

Alternatively, if the objection had not been waived, the Carlettis argue that it falls within the "present sense impression" exception to the hearsay rule. A present sense impression is "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Pa.R.E. 803(1). A statement may fall under this hearsay exception if it occurred either contemporaneous with or immediately after an event the statement describes. The contemporaneousness of the statement ensures its reliability.

> The declaration is "instinctive rather than deliberative—in short, the reflex product of immediate sensual impressions, unaided by retrospective mental action. These are the indicia of verity which the law accepts as a substitute for the usual requirements of an oath and opportunity for cross-examination."

**(Footnote continued on next page…)**

Because there was competent evidence in the record for a jury to find that the hump in the roadway was the cause of Mr. Carletti's injuries, the trial court properly denied PennDOT's request for JNOV.

## III.

However, even if the trial court properly denied the request for JNOV, PennDOT contends that it is entitled to a new trial. To be entitled to a new trial, it must be shown that a "mistake" was made at trial, and that mistake is sufficient basis for granting a new trial. *Luzerne County Flood Protection Authority v.*

---

**(continued…)**

*Municipality of Bethel Park v. Workmen's Compensation Appeal Board (Willman)*, 636 A.2d 1254, 1257 (Pa. Cmwlth. 1994) (*quoting* Edmund Morgan, *Res Gestae*, 12 Wash. L. Rev. 91 (1928)).

The present sense impression exception imposes no arbitrary time limit, but "shortly thereafter" refers to mere minutes rather than tens of minutes. A 30-minute lapse in time between the statement and the incident exceeds the scope of the present sense impression exception. *See Commonwealth v. Yancy* (Pa. Super., 2604 E.D.A. 2012, filed Aug. 1, 2013). The Superior Court has held that a ten-minute lapse in time from an eyewitness' statements to a police officer after a motorcyclist's collision with a tractor trailer did not fall within the present sense impression hearsay exception. *See Croyle v. Smith*, 918 A.2d 142 (Pa. Super. 2007). *But see McCurdy v. Greyhound Corporation*, 346 F.2d 224, 226 (3d Cir. 1965) (approving the admission of a statement made ten or fifteen minutes after an accident). This standard is not, however, consistent, as the Superior Court has also held that a statement made to a police officer between five to ten minutes after an incident occurred fell within the exception. *Commonwealth v. Gray*, 867 A.2d 560, 571 (Pa. Super. 2005).

In this case, Sergeant McKinney arrived at the scene several minutes after the accident occurred. PennDOT does not contend that the statement did not occur "shortly thereafter"; but, without support, contends that Mr. Kauffman's statement does not fall within the exception because he made it in response to a question.

21

*Reilly*, 825 A.2d 779, 782 (Pa. Cmwlth. 2003). The moving party must demonstrate that he or she has suffered prejudice from the mistake. *Harman v. Borah*, 756 A.2d 1116 (Pa. 2000). Whether the trial court abused its discretion in granting or failing to grant a new trial depends on whether the trial court has rendered a judgment that is manifestly unreasonable, arbitrary or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias or ill will. *Id.* at 1123. Where the record adequately supports the trial court's reasons and factual basis, the court did not abuse its discretion. *Id.* (citing *Morrison v. Department of Public Welfare, Office of Mental Health (Woodville State Hospital)*, 646 A.2d 565, 570 (Pa. 1994)).

PennDOT argues that the trial court failed to give a proper limiting instruction to the jury concerning Gyorke's use of Mr. Kauffman's deposition testimony in forming his opinion. The trial court provided the following instruction:

> [I]f you find that the expert's testimony is not truthful, or it's not accurate, you reject it, just as you would any other witness's testimony. If you find, on the other hand, that the expert's testimony, or segments of it, are truthful and accurate, then it's going to be up to you to decide how significant it is, if at all, in this case. So in other words, the weighing of expert testimony is left to you, ladies and gentlemen, just as with every witness.
>
> ***
>
> But with respect to expert testimony, consider also the reasons that the expert gives you for his opinion. And are those – those reasons are very much like the pillars that hold up the roof of this building. If those pillars are weak, they're going to fall away, and the roof's going to

22

fall down. It's no longer supported. And so it is with an expert's opinion are the reasons that the expert gives you for those opinions. So consider the reasons that the expert gives you in his opinion, and then decide, are those reasons supported by the evidence in this case, that is the evidence that you – which you, ladies and gentlemen, find to be truthful and accurate, and worthy of some weight. Now if one of the expert witnesses had told you that he relied upon a particular fact, but you find, from the evidence, that fact is not so, the opinion is not supported in that regard. Similarly, if a witness depended on the non-existence of a fact, but you find, from the evidence, that that fact did exist, then, again, the opinion is not supported in that regard. **You've heard, in this case the records and reports upon which the expert relied were marked and offered into evidence, and you may consider the facts, the data, or the opinions reasonably relied upon by the expert in evaluating the basis of the expert's opinion, but it does not establish the truth of the underlying information.**

(R.R. at 473a – 475a.) (Emphasis added.)[9]

---

[9] The trial court found that PennDOT waived this issue because it did not take an exception to the instruction. The trial court explicitly stated prior to issuing jury instructions:

> The Court may give a limited instruction to the jury under Rule 105, that may – that it may consider the facts, data, or opinions reasonably relied upon by the expert under Rule 703 in evaluating the basis of that expert's opinion, but not as establishing the truth of the underlying information. So it will be up to the jury to recall what the basis of Mr. Gyorke's opinion was and there will be no mention of the Kauffman's [sic] testimony by either side, the Plaintiffs' or the Defendants'.

(R.R. at 456a – 457a.) Immediately thereafter, counsel for PennDOT stated:

> [PennDOT]: Your Honor, we take an exception to that and we ask you to abide by the rule in Rule 703 and Rule 105 as written in the

**(Footnote continued on next page…)**

We agree with PennDOT that this charge was inadequate because it did not inform the jury that, since Mr. Kauffman did not testify, Gyorke's opinion as to causation could not be based on Mr. Kauffman's deposition testimony because that testimony was impermissible hearsay. By omitting specific references to Mr. Kauffman's deposition testimony in its instruction, the trial court put the onus upon the jury to determine what precisely was the underlying foundation of Gyorke's opinion. This error was compounded because the trial court instructed counsel that neither was to refer to Mr. Kauffman's deposition or statements in their closing arguments for any purpose. Under Pennsylvania Rule of Evidence 105, "[i]f the court admits evidence that is admissible against a party or for a purpose – but not against another party or for another purpose – the court, on timely request, must restrict the evidence to its proper scope and instruct the jury

---

**(continued…)**

> statute. Specifically, it says, when an expert testifies about the underlying facts and data that support the expert's opinion and the evidence would be otherwise inadmissible. The Trial Judge upon request, must, and we're asking this Court to do so, instruct the jury to consider the facts and data only to explain the basis for the expert's opinion and not as substantive evidence. And we would ask this Court to instruct the jury that the facts that the expert relied on are not substantive evidence in this case.
>
> The Court: Well some of the facts are and some aren't and you're just getting back into this and I'm trying to clean up the business about the Kauffman's [sic] and the hearsay aspects of it and –
>
> [PennDOT]: And we would ask specifically regarding the Kauffman's [sic] testimony is not substantive evidence in this case.

(R.R. at 457a – 458a.) Clearly, PennDOT requested a more specific instruction, which the trial court acknowledged when it said to PennDOT's counsel, "[Y]ou have an exception on the record, of course." (R.R. at 461a.)

24

accordingly." Pa.R.E. 105. Despite PennDOT's request to do so, the trial court did not do as required. Because the trial court made a legal error and abused its discretion in failing to grant PennDOT a new trial, we reverse the trial court's order and remand the matter for a new trial.


_____
DAN PELLEGRINI, Senior Judge

25

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David Carletti and Brenda Carletti,    :
h/w    :
    :
    v.    :  No. 1312 C.D. 2017
    :
Commonwealth of Pennsylvania,    :
Department of Transportation,    :
    Appellant    :

# **O R D E R**

AND NOW, this 17th day of July 2018, the Court of Common Pleas of Delaware County's order dated September 7, 2017, is reversed, and we remand this matter for a new trial.

Jurisdiction relinquished.

_____
DAN PELLEGRINI, Senior Judge